THE PEOPLE OF THE STATE OF ILLINOIS, ) Appeal from the

) Circuit Court of

Plaintiff-Appellee, ) Cook County.

)

) No. 98 CR 5117

)

RUBEN ALVAREZ, ) Honorable

) Bertina E. Lampkin,

Defendant-Appellant. ) Judge Presiding.

JUSTICE REID delivered the opinion of the court:

Following a jury trial, which was part of three simultaneous separate juries, the defendant, Ruben Alvarez, was found guilty of first degree murder and was sentenced to serve 80 years' imprisonment.  On appeal, Alvarez maintains that: (1) he was denied his due process right to fundamental fairness and his sixth amendment right to present a defense as a result of the trial court's decision not to admit certain evidence about the police investigation concerning different suspects, (2) he was denied a fair trial by the admission of improper hearsay, (3) he was denied a fair trial due to the admission of evidence that showed that he had a propensity to commit crimes, (4) he was denied a fair trial as a result of the State eliciting an inordinate amount of irrelevant and prejudicial gang-related evidence, (5) he was denied a fair trial due to the admission of evidence concerning weapons that were not connected to the crime, (6) he was denied a fair trial because the State made improper statements during its closing argument, and (7) his extended-term sentence of 80 years, which was based on a finding by the trial court (as opposed to the jury) that the crime was accompanied by exceptionally brutal and heinous conduct, is excessive and improper.  For the reasons that follow, we affirm Alvarez's conviction and vacate his extended-term sentence.   

THE FACTS

On the evening of December 29, 1997, Arnold Mireles was walking home from work.  As he was walking, someone approached Mireles from behind and shot him once in the back of his head.  Mireles died as a result of his wound.

Mireles was a community activist who worked at the Juan Diego Community Center, which is located at 8802 South Exchange Avenue, in Chicago, Illinois.  Part of Mireles' responsibilities was to take photographs of dilapidated buildings and make reports to housing court in an effort to have the buildings' owners make needed repairs to the properties.  Mireles' reports often cited codefendant Roel Salinas.

Salinas was the owner of a number of buildings that Mireles  investigated.  Mireles' efforts caused Salinas to have to appear in housing court on many occasions.  This resulted in Salinas being forced to pay numerous fines and other monies and serve jail time in an effort to have his buildings brought into compliance with city codes.  

A particular Salinas building that Mireles caused to be investigated was located at 8822 South Exchange Avenue.  Salinas eventually deeded this building to codefendant Miguel Martinez.  After Martinez became the owner of the building, he, too, was then forced to appear in housing court as a result of the building's violations.  Alvarez, who was a close friend of Martinez, lived with Martinez at 8822 South Exchange Avenue.

At trial, Donald Rowans testified that on the evening of December 29, 1997, he was at the home of his friend, Michael Quiroz, which was located at 8812 South Exchange Avenue.  While there, Rowans heard a gunshot at approximately 11 p.m.  Sometime later, he and Quiroz decided to walk to a store that was located on the corner of 89th Street and Exchange Avenue.  While in route to the store, Rowans discovered Mireles' dead body lying on the ground.  Rowans and Quiroz notified the police.   

Later that evening, Rowans and his girlfriend went to the Taste of Commercial, which is a neighborhood restaurant.  There, he saw Alvarez and Martinez, who were together.  Rowans told them that someone had been shot and that he had just found the dead person's body.  Afterwards, Martinez, who was driving, gave Rowans and his girlfriend a ride to Rowans' home.  Rowans lived at 8842 South Exchange Avenue, which was located on the same block where Martinez lived.  Later that night, Rowans also visited Martinez's home.  While he was there, the police arrived and conducted interviews.  

The next day, on December 30, 1997, at approximately 6 p.m., Rowans and Quiroz went to Martinez's home.  While he was there, Alvarez asked Rowans to search his gangway for a shell casing.  Later that same evening, Rowans informed Alvarez that he had heard the gunshot from the previous night and that it sounded like a .38- or .44-caliber gun.  Alvarez responded that it was a 9-millimeter gun.  

Alvarez explained to Rowans that he crept behind Mireles and shot him with his 9-millimeter plastic Glock handgun.  Alvarez said that when Mireles fell to his knees, he ran away.  Alvarez ran towards Rowans' house and saw that his gun had jammed.  When he unjammed it, a shell casing fell but Alvarez did not have time to find it so he kept running.

On cross-examination, Rowans testified that he was picked up by the police on January 1, 1998, and was transported to Area Two where he was interrogated and also appeared in a lineup.  During the interrogation he testified that he failed to inform the authorities that Alvarez had admitted to him that he had murdered Mireles.  However, on redirect examination, Rowans testified that he did not tell the police about his conversation with Alvarez because he did not want to get involved.  Rowans informed the authorities of Alvarez's admission after Alvarez had been arrested.

Crispin Uvalle testified that prior to December 1997, he had known Alvarez for approximately five months.  Uvalle testified that he and Alvarez were friends and in the same gang.  On January 1, 1998, he was sitting in a car in Cicero, Illinois, with Alvarez, Robert Espinoza and the young woman who owned the vehicle.  At this time, Alvarez told him that he shot a man in the back of the head.  Alvarez explained that he shot the man on the corner of 88th Street and Exchange Avenue.  Uvalle testified that Alvarez said that "he ran up to him and shot him in the back and the guy fell to his knees and then to his face."  Alvarez then ran through a gangway to Martinez's house.  Uvalle testified that Alvarez said that he shot the man for money.

Detective John Murray testified that on January 4, 1998, he was assigned to assist with the Mireles' murder investigation.  On the morning of January 14, 1998, Detective Murray along with his partner Detective Bob Rodriguez were attempting to locate Alvarez.  They first went to Martinez's home at approximately 

4 a.m.  When they arrived, Martinez's wife, Erasema Martinez (Erasema), answered the door.  She explained to the officers that Alvarez was not there but allowed the detectives to enter where they spoke with Martinez.  Erasema and Martinez subsequently agreed to accompany the detectives to Area Two.  After the detectives transported Erasema and Martinez to Area Two, they continued their attempt to locate Alvarez.

The detectives drove to a house that was located at 1803 South 61st Court in Cicero, Illinois.  Upon arriving, Ronald Kulick answered the door and he gave the detectives permission to enter his home.  Once inside, the detectives proceeded to the basement.  There, they found Espinoza seated on a couch.  After further searching, Detective Murray testified that he found Alvarez in a closet attempting to hide behind clothes.  Alvarez was taken into custody.  When the detectives continued their search of the basement, Detective Murray testified that he found a ".9 millimeter Glock semiautomatic pistol secreted behind a bar area behind a mirror." 

Detective Murray testified that Alvarez was taken to Area Two where he was questioned by the detectives.  Initially Alvarez denied having any participation in Mireles' murder.  At this point, the detectives left Alvarez and spoke with Espinoza for approximately 45 minutes.  When the detectives returned, they informed Alvarez that they had spoken to several people at the station who were his confidants and friends.  They explained that the people had given them some specific information regarding Mireles' murder.  After being told this, Detective Murray testified that Alvarez decided to give the detectives the following oral statement.

Alvarez informed the detectives that he was 17 years old.  Alvarez said that during the first week in December 1997, he was working on the roof of a building at 88th Street and Houston Avenue, when he was approached by Salinas.  Alvarez knew Salinas because Salinas had sold the building at 8822 South Exchange Avenue to Martinez.  Salinas told Alvarez that he knew that Alvarez had access to guns and that he had a problem which he wanted Alvarez to take care of.  

When Alvarez asked Salinas what the problem was, Salinas informed him that there was a fat guy by the name of Arnold who was continually having him fined and jailed for problems with his buildings.  Salinas said that this was costing him a lot of money and that he wanted the problem stopped.  Salinas then offered $10,000 for the head of Mireles.  Detective Murray testified that he asked Alvarez what he thought Salinas meant by this statement.   Alvarez replied that he took Salinas' statement to mean that Salinas would pay him $10,000 if he killed Mireles.  When Alvarez told Salinas that he would think about it, Salinas countered that he would pay Alvarez the $10,000 if he committed the murder or arranged to have someone else commit the murder.  Salinas further told Alvarez that he would be gone for three weeks around the Christmas holiday and that he would pay Alvarez when he returned if the job had been completed by that time.  Alvarez explained that he knew that Arnold was Arnold Mireles, who ran the community center at the end of his block.  Alvarez also stated that he knew Salinas was having a lot of problems with Mireles about his buildings.

Alvarez said that on the night of December 29, 1997, he was at home with Martinez when they agreed to go to the area of 51st Street and Maplewood Avenue for the purposes of committing robberies.  The two exited Martinez's home and walked to Martinez's car, which was parked in the front.  As the two sat in Martinez car waiting for it to warm up, Alvarez saw Mireles walking on Exchange Avenue.  He then told Martinez to drive into the alley.  Alvarez said that he was armed with a 9-millimeter Glock semiautomatic pistol and a snub nosed .38-caliber revolver.

Alvarez said that once Martinez drove into the alley, he told Martinez to drive behind his house and to stop.  After Martinez did so, Alvarez told Martinez to stay there.  Alvarez then exited the car and ran down the gangway of Martinez's residence.  When he got to the front of the residence, Mireles had already passed by and was now close to 89th Street.  

Alvarez said that he exited the gangway and ran up behind Mireles, cocking the .38 as he did so.  As he got closer, Alvarez pointed the gun to the back of Mireles' head and fired one shot.  Detective Murray testified that Alvarez stated that he saw blood fly from the back of Mireles' head and that Mireles dropped to his knees, then fell facedown in the snow.  Alvarez then ran back to the alley and got into the car with Martinez and told Martinez to drive away.  

Assistant State's Attorney (ASA) Thomas Mahoney subsequently took Alvarez's court-reported statement where he again gave essentially the same statement that he gave to Detective Murray.  

Over the objection of the defendant the State elicited testimony from Evelyn Carvajal, Rita Bautista and Cindy Garcia regarding a conversation that was had when Alvarez returned home.  Evelyn allegedly accused Alvarez of shooting the deceased; she then was allowed to testify that the defendant said "shut the fuck up."  The State argued that this was an alleged admission by Alvarez.  The State takes the position that Evelyn's testimony was not hearsay because her accusation was based on her personal knowledge and she was also cross-examined.  However, the defendant argues that the testimony of both Cindy Garcia and Rita Bautista was hearsay because it constituted an improper corroboration of Evelyn's testimony as a prior consistent statement.  Alvarez further argues that the angry response attributed to him was not an admission because it is not a statement from which guilt can be inferred.  On the contrary, Alvarez argues, it is more likely that his retort was a denial of the accusation.

 At trial, Alvarez testified that he did not know Salinas prior to Mireles being murdered.  He said that he met Salinas for the first time on January 16, 1998, while they both were in Cook County jail.  

On the night of December 29, 1997, Alvarez said that he and Martinez drove to Burger King to purchase food for the women in Martinez's home.  The two then drove back to Martinez's home, and Alvarez took the food inside while Martinez waited in the car.  While inside, Alvarez got a blanket to take with him when he left.  Alvarez said that he took the blanket because it had begun to grow colder outside and the heater in Martinez's car was broken.  

Alvarez testified that he was carrying a 9-millimeter gun.  He said that he did not have any other weapon at the time.  He and Martinez had planned to go to a nightclub located at 51st Street and Maplewood Avenue.  However, while they were on the way, they decided to stop at the Taste of Commercial restaurant, where they ate and played video games.  During this time, Rowans and his girlfriend entered the restaurant and informed them that someone had been shot and killed on the corner of 89th Street and Exchange Avenue.  They then gave Rowans and his girlfriend a ride home, and afterwards, the two then went back to Martinez's house.

On the day of his arrest, Alvarez testified that he was hiding in the closest because at the time he had an outstanding juvenile warrant.  At the police station, Alvarez said that Detective Murray berated, choked and slapped him.  Alvarez denied admitting to Detective Murray that he murdered Mireles, and he denied the admission that was given to ASA Mahoney.

At the conclusion of trial, the jury returned a verdict of guilty.  During sentencing, the trial court found that the murder was accompanied by exceptionally brutal and heinous behavior indicative of wanton cruelty, and sentenced Alvarez to an extended-term sentence of 80 years' imprisonment.

ANALYSIS

I

Alvarez contends that he was denied his due process right to fundamental fairness and his sixth amendment right to present a defense as a result of the trial court's improper evidentiary rulings.  Specifically, Alvarez maintains that he should have been allowed to: (1) question Arlander Frieson, an African-American, about participating in a lineup in connection with Mireles' murder, (2) question Detective Paul Alfini about the fact that he questioned Martha Grande and conducted a lineup of five African-Americans, which Grande viewed, and (3) elicit testimony from Detectives Fassel, Ramirez and Rodriguez that they were informed that an individual by the name of Brandon Miller had been bragging about murdering Mireles.

Alvarez complains that he was arrested because overzealous police officers were under intense public and media pressure to solve Mireles' murder.  Alvarez argues that the prohibited evidence was relevant because it supports his theory that the crime was committed by another individual.  Alvarez avers that the trial court's evidentiary rulings prevented him from presenting a defense by excluding details of the police investigation regarding the investigation of other individuals who were suspected of shooting Mireles.  

"Evidentiary rulings are within the sound discretion of the trial court and will not be disturbed absent an abuse of that discretion."  
People v. Harris
, 333 Ill. App. 3d 741, 747 (2002).

"An extrajudicial declaration not under oath, by the declarant, that he, and not the defendant on trial, committed the crime is inadmissible as hearsay, though the declaration is against the declarant's penal interest. [Citations.]  Such declaration may, however, be admitted where justice requires.  [Citation.]  Thus, where there are sufficient indicia of trustworthiness of such extrajudicial statements, a declaration may be admissible under the statements-against-penal-interest exception to the hearsay rule. [Citation.]

The 
Chambers[ v. Mississippi
, 410 U.S. 284, 35 L. Ed. 2d 297, 93 S. Ct. 1038 (1973),] court referred to four specific objective indicia of trustworthiness: (1) the statement was made spontaneously to a close acquaintance shortly after the crime occurred; (2) the statement was corroborated by other evidence;  (3) the statement was self-incriminating and against the declarant's interest; and (4) there was adequate opportunity for cross-examination of the declarant. [Citation.]  The presence of all four factors is not a condition of admissibility.  'They are indicia, not hard and fast requirements.' [Citation.]  The question to be considered in deciding the admissibility of such an extrajudicial declaration is whether it was made under circumstances which provide 'considerable assurance' of its reliability by objective indicia of trustworthiness.  [Citations.]"  
People v. Cruz
, 162 Ill. 2d 314, 342-43 (1994).

Our supreme court has held that a police officer's testimony recounting steps taken in a police investigation is admissible and does not violate the defendant's sixth amendment rights so long as the officer's testimony does not gratuitously reveal the content of a nontestifying witness' statement and so inform the jury that the witness stated that the defendant was responsible for the crime.  
People v. Henderson
, 142 Ill. 2d 258, 304 (1990).

Where the content of the nontestifying witness' statement is not revealed, the mere fact that the jury could infer that something the nontestifying witness said caused the police to suspect the defendant does not mean that the defendant has the right to cross-examine the nontestifying witness.  
Henderson
, 142 Ill. 2d at 304.  Further, the officer's testimony does not constitute inadmissible hearsay if he does not testify as to the content of the nontestifying witness' statement.  
People v. Gacho
, 122 Ill. 2d 221, 248-49 (1988).

Here, the prohibited evidence was either irrelevant or hearsay, and as such, the trial court's decision was proper.  The mere fact that the police questioned Frieson and had him participate in a lineup is irrelevant.  There is absolutely no evidence which suggests that he was identified as the shooter.  In particular, this evidence is irrelevant in proving the defense's claims that the police were under intense pressure to solve this case and that they consequently coerced Alvarez into giving a statement.  Instead, it appears the defense's true intention was to show the jury that an African-American was the first initial suspect in this matter.  

Regarding Grande, although it was not barred from doing so, the defense did not call her to testify at trial.  It appears the defense did not call Grande because her testimony would not have been helpful to its case.  

Alfini's testimony concerning Grande's statements do not fall under an exception to the hearsay rule.  The detective's testimony concerning Miller are clearly hearsay.  The statements concerning Miller were not made by him and cannot be considered statements against his penal interest. 

Further, if any error occurred, it is deemed harmless in the face of the overwhelming evidence of Alvarez's guilt.  The record reflects that Alvarez made four different admissions to killing Mireles.  He made oral and written admissions to the authorities and also admitted to Rowans and Uvalle that he killed Mireles.  

II

Alvarez contends that the trial court improperly allowed the State to introduce testimony that Alvarez told Evelyn Carbajal to "shut the fuck up" when she accused him of killing Mireles.  Alvarez argues this testimony was inadmissible hearsay because it  did not qualify as an admission.  Instead, Alvarez maintains that the statement was an angry slang retort that protested Carbajal's accusation.  

Here, it does not appear that Alvarez's statement qualified as an admission.  However, any error that may have occurred as a result of the statement being admitted appears to be harmless due to the considerable evidence of Alvarez's guilt.

III

Alvarez claims he was denied a fair trial as a result of the admission of evidence which showed that he had a propensity to commit crimes.  At trial, Detective Murray testified that when Alvarez gave his oral statement, he said that he and Martinez left Martinez's house with the intent to commit robberies.  Alvarez argues that Detective Murray's testimony was irrelevant and that it improperly implied that he had a predisposition or propensity to commit crimes.

"In general, evidence of other crimes is not admissible if it is relevant merely to establish the defendant's propensity to commit crime.  See 
People v. Thingvold
, 145 Ill. 2d 441, 452 (1991); 
People v. Illgen
, 145 Ill. 2d 353, 364 (1991).  Evidence of the defendant's commission of other crimes is admissible, however, where relevant to prove any material question other than the defendant's propensity to commit crime, including 
modus
 
operandi
, intent, identity, motive, or absence of mistake. See 
Thingvold
, 145 Ill. 2d at 452; 
Illgen
, 145 Ill. 2d at 364-65.  In considering the admissibility of other-crimes evidence, the trial judge must weigh its probative value against its prejudicial effect on the defendant, and may exclude the evidence if its prejudicial effect substantially outweighs its probative value. See 
Illgen
, 145 Ill. 2d at 365.  The trial court's ruling as to the admissibility of other-crimes evidence will not be reversed absent a clear showing of abuse of discretion.  See 
Illgen
, 145 Ill. 2d at 364."  
People v. Kliner
, 185 Ill. 2d 81, 146 (1998).

Alvarez was not denied a fair trial as a result of Detective Murray's testimony.  Alvarez's statement evinced a plan to commit a future crime, and as such, did not violate the bar against revealing a defendant's prior criminal activity.  Any error that may have occurred was harmless.  Also, Alvarez admitted on direct examination that he had committed previous criminal offenses, and as such, he should not have been prejudiced by Detective Murray's testimony.  Again, if any error occurred, it appears to be harmless in the face of the evidence that the State introduced at trial.

IV

Alvarez contends that he was denied a fair trial because the State elicited an inordinate amount of gang-related evidence.  Alvarez maintains that it was the State's theory of the case that he killed Mireles for money.  Salinas, who was not in a gang, wanted Mireles dead because of Mireles' activities in the community.  It was not the State's theory that Salinas wanted Mireles dead because of gang affiliations.  Alvarez maintains the fact that he was in a gang was irrelevant and extremely prejudicial as it inflamed the passions of the jury.

"Evidentiary rulings regarding gang-related evidence are reviewed for abuse of discretion.  
People v. Gonzalez
, 142 Ill. 2d 481, 489-90 (1991).  Gang membership evidence is admissible only when there is sufficient proof that the membership is related to the crime charged.  
People v. Smith
, 141 Ill. 2d 40, 58 (1990).  However, once such a relationship is shown, such evidence may be admitted so long as it is relevant to an issue in dispute and its probative value is not substantially outweighed by its prejudicial effect.  
People v. Johnson
, 159 Ill. 2d 97, 118 (1994); see also 
People v. Lucas
, 151 Ill. 2d 461, 480 (1992), quoting 
People v. Monroe
, 66 Ill. 2d 317, 322 (1977), quoting Fed. R. Evid. 401 ('[e]vidence of gang affiliation and/or gang involvement in gang-related activity is relevant if it tends "'to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence'"').  One of the purposes for which gang evidence is admissible is to 'provide a motive for an otherwise inexplicable act.'  
Smith
, 141 Ill. 2d at 58."  
People v. Villarreal
, 198 Ill. 2d 209, 232-33 (2001).

In the instant case, the defendant told the authorities that when Salinas solicited him to kill Mireles: "He came to me and told me he knew what I was capable of doing.  He knew the situation I was in with the guns.  He knows I was able to get guns."  On direct examination at trial defendant testified that he was a member of the Bishops street gang.  On cross-examination, defendant testified that he always carried a gun because he was a gang member.  Defendant also told the authorities that he disposed of a murder weapon by leaving it in "a hiding spot where the Bishops put all their guns at."  The evidence regarding defendant's gang membership was arguably relevant to explain why Salinas solicited defendant and what defendant did with the murder weapon.  We recognize that the probative value of this gang evidence may have been outweighed by its prejudicial effect.  However, in the face of the evidence that the State produced and the gang-related testimony that Alvarez himself gave, the error is harmless beyond a reasonable doubt.

V

Alvarez claims he was denied a fair trial as a result of testimony that was permitted about weapons that were not connected to the crime.  Alvarez argues that repeated testimony was allowed about his 9-millimeter handgun which he maintains was not the murder weapon.  There was also testimony elicited about an AK-47 seen at Martinez's home that was not the murder weapon.  Alvarez argues that this testimony should have been disallowed because it was irrelevant and highly prejudicial. 

Relevant evidence is that which has any tendency to make the existence of any fact of consequence to the determination of the action more or less probable than it would be without the evidence.  
People v. Peeples
, 155 Ill. 2d 422, 455-56 (1993). Evidence is admissible if it is relevant to a material issue and its probative value is not substantially outweighed by its

prejudicial effect.  
People v. Burrows
, 148 Ill. 2d 196, 231 (1992). 

The evidence concerning the AK-47 was improperly admitted.  It is not the State's theory that Mireles was killed with an assault rifle.  However, the evidence concerning Alvarez's 9- millimeter was relevant as Alvarez told Rowans that he used a 9- millimeter handgun to shoot Mireles and he left a shell casing in a hallway at the scene of the shooting.  Defendant also told the authorities that he was armed with a 9-millimeter and a .38- caliber handgun when he shot the victim.  There was no ballistic evidence recovered at the crime scene and the medical examiner never stated the caliber of the weapon that was used to shoot Mireles.  The 9-millimeter handgun admitted into evidence was found in the basement where defendant was arrested.  All of these facts support the admission of the 9-millimeter.  In light of the overwhelming evidence of guilt, any error relating to admission of the AK-47 into evidence is harmless beyond a reasonable doubt.

VI

Alvarez maintains the State committed reversible error when it made improper statements during its closing argument that were not supported by the record.  In particular, Alvarez complains about the State's comments that: (1) Salinas solicited him to kill Mireles because he had access to guns and was a gang member, and (2) girls in Martinez's house 
knew
 that he had shot Mireles.  Alvarez contends that these statements were not supported by the record and tainted the jury so as to deny him a fair trial.

It is well settled that prosecutors enjoy wide latitude in closing arguments, and the scope of permissible argument rests within the sound discretion of the trial court. Absent a clear abuse of discretion, the court's determination of the propriety of the argument will stand.  
People v. Hester
, 271 Ill. App. 3d 954, 957 (1995).  Any improper comments or remarks made by a prosecutor in closing argument are not reversible error unless they are a material factor in the conviction or cause substantial prejudice to the accused.  
People v. Sutton
, 316 Ill. App. 3d 874, 893 (2000).  In reviewing allegations of prosecutorial misconduct, the court must consider the arguments of both the prosecutor and the defense in their entirety and place the allegations of improper comments in context.  
Sutton
, 316 Ill. App. 3d at 893.  To warrant a reversal, the prosecutorial remarks must result in substantial prejudice to the accused, such that the verdict would have been different had the improper comments not been made.  
People v. Terry
, 99 Ill. 2d 508, 517 (1984).

The State's closing argument was proper because it was based on the facts that were adduced at trial or reasonable inferences drawn therefrom.  As to the State's comments concerning why Salinas solicited  Alvarez to kill Mireles, Alvarez's statement supports the State's closing argument.  In Alvarez's statement, he stated that Salinas "came to me and told me he knew what I was capable of doing.  He knew the situation I was in with the guns.  He knows I was able to get guns."  Furthermore, during his testimony, Alvarez admitted to being a gang member.

As to the State's comments concerning the women in Martinez's house knowing that Alvarez committed the shooting, the State's comments were supported by the evidence.  Evelyn Carbajal, who was staying with Martinez at the time of the occurrence, testified that she told Alvarez on the night of the shooting, "I know you killed that guy on the corner."

VII

Alvarez maintains that his extended-term sentence of 80 years is excessive when his age, previous criminal record and potential to rehabilitate are taken into consideration.  Alvarez contends that since he was only 17 years old at the time of the occurrence and only had a juvenile record, the trial court should have only given him the minimum sentence of 20 years.  Further, Alvarez argues that the trial court improperly found that the murder was accompanied by exceptionally brutal and heinous conduct, and that his extended-term sentence violates 
Apprendi v. New Jersey
, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000). 

A trial court's sentencing determination must be based on the particular circumstances of each case, including factors such as the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age.  
People v. Fern
, 189 Ill. 2d 48, 53 (1999); 
People v. Perruquet
, 68 Ill. 2d 149, 154 (1977).  Generally, the trial court is in a better position than a court of review to determine an appropriate sentence based upon the particular facts and circumstances of each individual case.  
Perruquet
, 68 Ill. 2d at 154.  Thus, the trial court is the proper forum for the determination of a defendant's sentence, and the trial court's decisions in regard to sentencing are entitled to great deference and weight.  
Perruquet
, 68 Ill. 2d at 154.  Absent an abuse of discretion by the trial court, a sentence may not be altered upon review.  
Perruquet
, 68 Ill. 2d at 154.  If the sentence imposed is within the statutory range, it will not be deemed excessive unless it is greatly at variance with the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense.  
Fern
, 189 Ill. 2d at 54.

Our supreme court recently held in 
People v. Swift
, 202 Ill. 2d 378, 392 (2002), that for purposes of 
Apprendi
 analysis, the sentencing range for first degree murder is 20 to 60 years' imprisonment, and that any sentence greater than 60 years requires additional factual findings that must be proven beyond a reasonable doubt.  
Swift
, 202 Ill. 2d at 392.  Specifically, the court in 
Swift
 indicated as follows: 

"We conclude that for purposes of 
Apprendi
 analysis, the 'sentencing range' for first degree murder in Illinois is 20 to 60 years' imprisonment. This is the only range of sentence permissible based on an ordinary jury verdict of guilt.  Although there is statutory authorization for higher sentences to be imposed for this crime, any sentence longer than 60 years requires additional factual findings. See 730 ILCS 5/5-8-2(a) (West 1998) (extended-term sentence); 730 ILCS 5/5-8-1(a)(1)(b), (a)(1)(c) (West 1998) (life imprisonment); 720 ILCS 5/9-1(g), (h) (West 1998) (death penalty).  According to 
Apprendi
, any factual findings which take a sentence above the sentencing range must be proven to a jury beyond a reasonable doubt."  
Swift
, 202 Ill. 2d at 392.

Here, the trial court found that the offense was accompanied by exceptionally brutal and heinous behavior indicative of wanton cruelty.  Alvarez was consequently sentenced to serve an extended-term sentence of 80 years.   This determination was made without a jury finding, and as such, the State was not required to prove beyond a reasonable doubt that the crime was accompanied by brutal and heinous behavior as required by 
Swift
. 

In 
People v. Crespo
, 203 Ill. 2d 335 (2003), following a jury trial, the defendant received an extended-term sentence based on a posttrial finding by the trial court that the crime was committed in a brutal and heinous manner.  On appeal, the defendant contended that his extended-term sentence violated 
Apprendi
.  The 
Crespo
 court determined that 
Apprendi
 violations are reviewed under a plain error analysis.  
Crespo
, 203 Ill. 2d at 347, citing 
United States v. Cotton
, 535 U.S. 625, 152 L. Ed. 2d 860, 122 S. Ct. 1781 (2002)(applying plain error test because defendant did not object at the time of trial, even though 
Apprendi
 had not been decided until after defendant was convicted).  Under a plain error analysis, a defendant's conviction and sentence will stand unless the defendant shows the error was prejudicial.  
Crespo
, 203 Ill. 2d at 347-48, citing 
United States v. Olano
, 507 U.S. 725, 734, 123 L. Ed. 2d 508, 520, 113 S. Ct. 1770, 1778 (1993), 
People v. Thurow
, 203 Ill. 2d 352, 363 (2003).

Alvarez did not object at the sentencing hearing to his extended-term sentence, which was based on a finding by the trial court that the murder was accompanied by brutal and heinous conduct.  As such, this issue must be reviewed under a plain error analysis. In 
Crespo
 our supreme court adopted the reasoning of the Supreme Court in 
Cotton
, holding that an appellate court may correct an error not raised at trial, only if there was an (1) "error," (2) that is "plain", and (3) affects "substantial rights."  
Crespo
, 203 Ill. 2d at 348.  We find that the facts of he present case meet all three of these elements.  However, we may exercise our discretion to notice the forfeited error ' "only if (4) the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." ' 
Cotton
, 535 U.S. at ___, 152 L. Ed. 2d at 868. 122 S. Ct. at 1785 [, citation]."  
Crespo
, 203 Ill. 2d at 348.

In 
Crespo
, our supreme court looked at the facts of the attack which resulted in the victim's death in that case.  Among these was the fact that the defendant had stabbed the victim 24 times with an eight-inch kitchen knife and pulled her hair with such force that part of her scalp was torn from her head.  The supreme court aptly characterized this as overwhelming evidence that the crime was brutal and heinous.  The court concluded: "We have no doubt that a jury, presented with these facts, would have found that the crime was committed in a brutal and heinous manner, indicative of wanton cruelty.  Accordingly, defendant has failed to show that the error was prejudicial."  
Crespo
, 203 Ill. 2d at 348-49.

The State correctly cites 
People v. Andrews
, 132 Ill. 2d 451, 465 (1989), and 
People v. La Pointe
, 88 Ill. 2d 482, 501 (1981), for considering Webster's dictionary definition of "heinous" as "hatefully or shockingly evil: grossly bad: enormously and flagrantly criminal," and defined "brutal" as "grossly ruthless *** devoid of mercy or compassion: cruel and cold blooded."  Webster's Third New International Dictionary, 286, 1050 (1986).  In affirming the defendant's life sentence, the court in 
La Pointe
 focused on his significant history of criminal activity, callous attitude and complete lack of remorse, and premeditation.  Similarly, in 
People v. McGhee
, 238 Ill. App. 3d 864, 882 (1992), and 
People v. Benkowski
, 215 Ill. App. 3d 615, 620-21 (1991), this court held that premeditation and cold-bloodedness are sufficient to justify an extended sentence.  Defendant cites several cases in support of his argument that his actions did not constitute brutal or heinous conduct: 
People v. Andrews
, 132 Ill. 2d 451, 466-67 (1989), 
People v. Phillips
, 244 Ill. App. 3d 237, 240 (1993), 
People v. Gonzalez
, 231 Ill. App. 3d 1071, 1078-79 (1992), 
People v. Fields
, 198 Ill. App. 3d 438, 444-45 (1990), 
People v. Anderson
, 201 Ill. App. 3d 75, 80-81 (1990), and 
People v. Holiday
, 130 Ill. App. 3d 753, 757-58 (1985).

In the instant case, we simply cannot say that the evidence was so overwhelming that the crime was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty that we "have no doubt" that a jury would have made this finding.  Consequently, we must vacate defendant's extended-term sentence.

However, we reject the defendant's assertion that he should have been given the minimum sentence of 20 years.  Instead, we will only vacate Alvarez's extended-term sentence of 80 years and reduce it to 60 years.

CONCLUSION

For the foregoing reasons, the decision of the trial court is affirmed and Alvarez's extended-term sentence of 80 years is vacated.  Accordingly, the mittimus should be amended to reflect that Alvarez's sentence has been reduced to 60 years' imprisonment.

Affirmed in part and vacated in part.

Quinn, J. and Hartigan, J., concur.