# Illinois Official Reports

## Appellate Court

---

### *People v. Henderson*, 2017 IL App (1st) 142259

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RONALD HENDERSON, Defendant-Appellant. |
| District & No. | First District, Fifth Division<br>Docket No. 1-14-2259 |
| Filed<br>Rehearing denied | March 31, 2017<br>May 10, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 09-CR-16803(03); the Hon. William G. Lacy, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Tonya J. Reedy, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Michelle Katz, Jon Walters, and Nancy Colletti, Assistant State's Attorneys, of counsel), for the People. |
| Panel | PRESIDING JUSTICE GORDON delivered the judgment of the court with opinion.<br>Justices Lampkin and Reyes concurred in the judgment and opinion. |

**OPINION**

¶ 1      Defendant Ronald Henderson was convicted after a jury trial of the attempted first degree murders of Andre Turner and Joe Walker and the first degree murder of Chastity Turner during a drive-by shooting on June 24, 2009, and sentenced to a total of 100 years with the Illinois Department of Corrections.

¶ 2      On this appeal, defendant claims (1) that the State failed to prove defendant guilty beyond a reasonable doubt, (2) that the trial court erred by allowing testimony by a police officer that he issued an investigative alert for defendant's arrest after a photo array and statement by a witness who did not testify at trial, (3) that defendant was denied a fair trial when the State was permitted to introduce evidence of allegedly unrelated guns and other allegedly unrelated information, (4) that defendant was denied a fair trial by being tried jointly with codefendant Kevin Stanley when the evidence against Stanley was allegedly greater, (5) that defendant was denied a fair trial by allegedly inaccurate or misleading jury instructions, and (6) that the State committed prosecutorial misconduct during its closing arguments.

¶ 3      For the following reasons, we affirm defendant's conviction and sentence.

¶ 4                       BACKGROUND

¶ 5                      I. Procedural History

¶ 6      On September 15, 2009, a grand jury indicted defendant and codefendants, Kevin Stanley and Davionne Whitfield, for the first degree murder of nine-year-old Chastity Turner, as well as for the attempted first degree murders of Chastity's father Andre Turner and Joe Walker. All three were shot in front of Andre Turner's home on June 29, 2004.

¶ 7      On October 29, 2012, defendant filed a motion for severance, arguing that both of his codefendants might assert a defense antagonistic to him in the joint trial, which would then prejudice him and violate his right to confront witnesses if he could not cross-examine his codefendants. However, on May 13, 2013, when the motion was heard, the trial court asked defendant's counsel whom defendant wanted to be severed from, and counsel replied only "I want to be severed from Mr. Whitefield [*sic*]" but did not mention Kevin Stanley.

¶ 8      As a result, the trial court stated that it was granting defendant's motion and severed defendant and Stanley's trial from Whitfield's trial. Thus, defendant and Stanley were tried together before a single jury, while Whitfield had his own trial.

¶ 9                 II. State Witness Testimony

¶ 10     At the trial, which began on March 18, 2014, the State called 15 witnesses: (1) Dr. Lauren Woertz, (2) Andre Turner, (3) Julius Davis, (4) Donise Robertson, (5) Tawanda Sterling, (6) Joe Walker, (7) Officer Edward Garcia, (8) Officer John Sanders, (9) Officer Nancy DeCook, (10) Paul Presnell, (11) Mike Mazurski, (12) Aaron Horn, (13) Detective Timothy O'Brien, (14) Detective Michael O'Donnell, and (15) Lakesha Edwards.

¶ 11     Codefendant Kevin Stanley called four witnesses: (1) Darren Keith Paulk, (2) Keyon Taylor, (3) Alfonzo Deadwiler, and (4) Sergeant John Nowakowski.

¶ 12     The State's theory of the case was that defendant was the driver of the van used in the drive-by shooting. The evidence showed that a van approached Andre Turner's home and that

shooters inside the van opened fire, killing Andre's nine-year-old daughter, Chastity, and also hitting Andre Turner and Joe Walker.

¶ 13 No physical evidence linked defendant to the shootings. The evidence against him consisted primarily of identifications by three eyewitnesses: (1) Andre Turner; (2) Andre's girlfriend, Tawanda Sterling; and (3) Julius Davis. At the time of the shooting, Andre Turner and Tawanda Sterling were in front of Andre's home,[1] with the passenger side of the van facing them, while Julius Davis was across the street with the driver's side of the van facing him.

¶ 14 We provide below a detailed description of the evidence at trial because defendant argues on appeal that the three witnesses who identified him at trial all had obstructed or distracted views, that they did not identify him immediately after the shooting even though they had all known him for years, and that they all had a motive to frame him due to their connection to a rival gang. Defendant argues that, since their identifications were all weak or tainted, the scales were tipped against him by a police officer's testimony that a nontestifying witness viewed a photo array and the officer then immediately issued an alert for defendant's arrest.

¶ 15 We also provide a description of the evidence against codefendant Kevin Stanley and the evidence presented by Stanley, since one of defendant's claims is that he was denied a fair trial by being tried jointly with Stanley.

¶ 16                                    1. Dr. Lauren Woertz

¶ 17 Dr. Lauren Woertz testified that she has been an assistant medical examiner with the Cook County medical examiner's office since 2009 and that she is a forensic pathologist.

¶ 18 Dr. Woertz testified that, on June 25, 2009, a postmortem examination of Chastity Turner was performed by Dr. Valerie Arangelovich, who no longer works for the Cook County medical examiner's office. Dr. Woertz reviewed the postmortem examination performed by Dr. Arangelovich, since it is common practice for forensic pathologists to review examinations by colleagues who have left the medical examiner's office.

¶ 19 The examination of Chastity's body revealed that she had a bullet entrance wound on the right side of her back. Given the lack of gun powder stippling, Dr. Woertz opined that this gunshot wound was not the result of close range firing. A bullet was recovered from the right side of Chastity's neck.

¶ 20 With a reasonable degree of medical and scientific certainty, Dr. Woertz opined that the cause of death was a gunshot wound to the back and that the manner of death was a homicide. These opinions were consistent with those of Dr. Arangelovich in her postmortem exam of Chastity.

¶ 21 Dr. Woertz testified that Dr. Arangelovich noted some bruising on Chastity's body as well as three other healed wounds, none of which were gunshot wounds. Dr. Woertz noted that, given the "classic straightforward entrance wound," she was able to determine that this bullet was not a ricochet. The parties stipulated that a proper chain of custody was maintained at all times with regard to the sealed envelope containing the lead bullet fragment removed from

---

[1]Since both Chastity and her father, Andre, share the same last name, we will refer to them by their first names from this point on, to avoid confusion.

Chastity's body.

## 2. Andre Turner

Andre Turner testified that Chastity was his nine-year-old daughter and that Lakesha Edwards was Chastity's mother. He identified both defendant and Kevin Stanley in the courtroom and testified that he had known defendant for 10 or 11 years and had known Stanley almost all of his life.

Andre testified that, in June 2009, he was the leader of a set of the Gangster Disciples (GD) gang on the block of 7400 South Stewart Avenue, which was also where he lived. Andre knew a man named Gargamel, who was defendant's brother and the leader of the same set of GDs that occupied the 7500 block of South Normal Street, which was a short distance from Andre's block. Andre also knew Davionne Whitfield, otherwise known as Gucci, who was affiliated with the Normal Street block of GDs. At some point before June 2009, defendant and Whitfield were friendly with Andre and the Stewart Avenue block of GDs. However, by June 2009, they were no longer friendly with each other.

A few weeks prior to the shooting, Andre met with Gargamel, defendant's brother, to discuss a territorial proposition regarding the drug business between each other's blocks. Andre testified that he declined Gargamel's offer and afterwards Gargamel appeared to be upset.

Andre also testified that, in the few weeks before the shooting, there were several fights and shootings between his faction and Gargamel's faction, which revolved around disputes between the young members of each faction. Andre testified that he was present for some of these fights and shootings and that at one point he had won a fight between himself and defendant.

On June 24, 2009, at 6:45 p.m., there was a sizeable group of both adults and children outside Andre's home on South Stewart Avenue, including his girlfriend, Tawanda Sterling. Andre and Chastity were in the process of washing their three dogs. Andre was standing in his driveway in front of his house and facing the street when he received a phone call from Deannosha Sharkey[2] and then observed a van that he had never observed before driving on his street. Andre is colorblind, so he could not provide the accurate color of the van, but he observed it was moving toward himself, southbound, at a high rate of speed. When the van pulled up to where Andre was standing, the passenger's side was facing him, and the passenger side sliding door was already open. In addition, the front passenger side window was down.

Andre testified that, as the van approached, he was able to observe the front of the van and identified defendant as the driver. He also identified codefendant Kevin Stanley as the person in the front passenger seat who was hanging a little out of the open window and who began shooting at him. Andre believed that he heard over 10 shots fired, not all of which sounded the same. Andre witnessed only Kevin Stanley shooting and observed that Stanley was using a rifle with a wooden stock.

---

[2]Deannosha Sharkey is the nontestifying witness who is the subject of defendant's hearsay claim on appeal. As we will describe later, Detective Michael O'Donnell testified at trial that he conducted a photo array with Sharkey, who also provided a statement, and that after the photo array and statement, he issued an investigative alert for defendant's arrest.

¶ 29    Andre testified that, after the shooting started, he began grabbing the children and throwing them over a nearby fence. Andre had his back toward the van while he was in the process of placing the children behind the fence. While he was placing the children over the fence, he was struck by a bullet in his left bicep. He tried to jump over the fence but was unsuccessful, so he ran toward the van. The van sped off southbound when Andre came within 15 feet of it. As the van sped off, Andre observed Davionne Whitfield closing the passenger side sliding door.

¶ 30    Andre testified that, shortly after the van fled, a friend named Tim pulled up in front of his house. Andre's arm was gushing blood from a gunshot wound, so Andre asked Tim to drive him to the hospital. Tim transported Andre to St. Bernard's Hospital. However, Andre testified that he later woke up at Stroger Hospital in the intensive care unit (ICU) at some point during the night on June 24, 2009. Chicago police officers visited Andre in the ICU and notified him that Chastity had died. Andre believed from the officers' tone of voice that they were blaming him for Chastity's death and that they were not on his side. As a result, Andre refused to cooperate with the officers.

¶ 31    In the days and weeks following the shooting, Detectives Michael O'Donnell and Timothy O'Brien became involved in the murder investigation. Andre testified that his feelings toward the investigation changed after these detectives became involved because they were asking questions about the individuals who did the shooting rather than focusing on him. The detectives also were present at Chastity's funeral, which made a good impression on Andre.

¶ 32    Andre testified that, after he met with an assistant State's Attorney (ASA), he decided to cooperate with the investigation. On August 7, 2009, Andre was contacted by the detectives and travelled to the Area 1 Violent Crimes Office in order to view a lineup of suspects. During the first lineup, Andre identified Kevin Stanley as the shooter in the front passenger seat of the van. That same night, Andre met with an ASA and provided a typewritten statement. About 10 days later, Andre visited a courthouse and provided sworn testimony in front of a grand jury.

¶ 33    Andre testified that, on August 28, 2009, the detectives contacted him again, and he returned to the Area 1 Violent Crimes Office to view another lineup. Andre identified defendant as the driver of the van. Andre testified that he never identified defendant as a shooter and did not ever observe a gun in defendant's hands.

¶ 34    Upon cross-examination by counsel for Kevin Stanley, Andre testified that, around the time of the shooting, Andre was selling crack cocaine and using marijuana. However, Andre could not recall if he had used marijuana on the day of the shooting. Andre also testified that, when he received the phone call from Deannosha Sharkey, prior to the van pulling up, his back was facing the street.

¶ 35    Upon cross-examination by counsel for defendant, Andre again testified that he was not facing the street when he received the phone call from Deannosha Sharkey. When Andre received the call, he heard Julius Davis scream, "put you head up on that van," which means pay attention. After that statement, Andre was facing the street, and the shooting started. Andre's view of the van's driver was not obstructed by any glare from the sunlight. Defendant's counsel asked Andre about the statement he provided to an ASA on August 7, 2009, in which Andre stated that shots were fired before he could turn around and face the street. Andre testified that he did, in fact, state this in his statement to the ASA.

¶ 36    Upon redirect examination by the State, Andre testified that the sun was not in his eyes when he identified defendant as the driver. He also told the ASA in his statement on August 7,

2009, that he identified defendant as the driver.

¶ 37                              3. Julius Davis

¶ 38      Julius Davis testified that he recalled being on the 7400 block of South Stewart Avenue around 7 p.m. on June 24, 2009. At the time, Davis was standing on the southbound corner which was down the block and across the street from Andre's house. Davis observed many people in front of Andre's home when he also observed a van heading down South Stewart Avenue toward Andre's home. When he observed the van pulling up, he yelled "on that van," which meant to pay attention to it. Davis observed that the van stopped in front of Andre's home and that the occupants of the van began to shoot in the direction of the residence. Davis testified that he had known defendant for six or seven years, and he identified defendant as the driver of the van. As the van drove away from Andre's house, defendant shot at Davis from the driver's side. Davis observed that defendant had a gun, but Davis was unable to provide a description of the gun. Davis observed the van drive southbound and then make a westbound turn in the direction of Normal Street.

¶ 39      Davis testified that, during the evening of July 4, 2009, he met Detectives O'Brien and O'Donnell at the Area 1 Violent Crimes Office in order to view a photo array, from which he identified defendant. On August 28, 2009, Davis returned to Area 1 to view a physical lineup.

¶ 40      Upon cross-examination by counsel for defendant, Davis testified that the corner on which he stood was halfway down the block from Andre's house, on the opposite side of the street. He was standing by a liquor store on the corner and was drinking alcohol, but he did not state the type of alcohol. Even though Stewart Avenue allows parking on either side, Davis testified that there were probably not many vehicles parked at the time "because there don't be that many cars out there like that." He observed the van coming down the street and stopping in front of Andre's house. When the shots started, Davis took cover behind a nearby tree. Davis heard bullets ricochet off the tree which he was using for cover, and he tried to duck under some bushes in an attempt to escape from the bullets. Davis testified that the van drove past him at the same time he was moving away from the bullets. The van was not moving fast, but the whole incident lasted only a few seconds.

¶ 41                            4. Donise Robertson

¶ 42      Donise Robertson testified that, on June 24, 2009, she resided on South Stewart Avenue, on the opposite side of the street from Andre's home. Robertson had babysat two of Andre's children on June 24, 2009, and at around 5:45 p.m., Robertson and the children departed her home and walked across the street to Andre's home. Thirteen or fourteen people were present at that time.

¶ 43      Robertson testified that she and others went to purchase snow cones for the children. Chastity was outside preparing to wash Andre's dogs. Andre and Chastity were near the front fence and in the driveway, which was close to the sidewalk in front of the house. After returning, Robertson remained at Andre's home where she sat at the top of the porch with other people to watch the children playing in the front yard.

¶ 44      Robertson testified that she was still sitting on the porch at 6:50 p.m., when gunshots drew her attention to a teal-green van traveling southbound on Stewart Avenue toward her at Andre's house, with the passenger side of the van facing her. Robertson first observed the van

when it was near the garbage receptacles next door to Andre's home. She was not able to observe the driver but was able to identify Kevin Stanley as the shooter in the front passenger seat. She observed Stanley hanging out of the front passenger window as he was shooting. Robertson testified that she had known Stanley for four or five years at this point and that she had a clear, unobstructed view of Stanley during the shooting.

¶ 45      Robertson testified that she observed another individual, Davionne Whitfield, shooting from the right-side passenger sliding door of the van. She identified him as "Gucci Man." Robertson's eldest son was friends with Whitfield, and she recognized him as someone who had come in and out of her home during the past two or three years.

¶ 46      Robertson testified that, when the shooting began, she dropped to the floor of the porch and thus was unable to observe what happened to the van after the shooting started. Following the shooting, Robertson took the two children she was babysitting back to her house across the street. After a couple of minutes, the police arrived. She went back to the scene after the police asked to talk to her. Robertson informed the first responding officers that she knew who did it and provided them with the nicknames of the shooters—"Kevo" for Kevin Stanley and "Gucci" for Davionne Whitfield.

¶ 47      Robertson testified that, at around 8:30 p.m. that same night, she went to the Area 1 Violent Crimes Office, where she met with Detective Timothy O'Brien. Robertson received a set of photographs to review and identified Whitfield from the first photo array. Approximately three hours later, Robertson met with another detective, Detective Brian Lutzow, and viewed a second photo array, from which she identified Kevin Stanley as the shooter in the front passenger seat. About an hour after that, Robertson viewed a physical lineup and identified Whitfield as the shooter in the back of the van.

¶ 48      Robertson testified that, on June 26, 2009, she met with an ASA and a detective, and gave a handwritten statement. On July 9, 2009, Robertson appeared before a grand jury. On August 7, 2009, Robertson returned to Area 1 to view another physical lineup, from which she identified Kevin Stanley as the other shooter.

¶ 49                          5. Tawanda Sterling

¶ 50      Tawanda Sterling testified that, on June 24, 2009, she was living with Andre Turner and his mother on South Stewart Avenue and was in a relationship with Andre. Sterling was at Andre's home at 6:50 p.m. on June 24, and there were many people, both on the porch and in the front yard. Around 6:50 p.m., Sterling was at the bottom of the porch and observed Andre and his daughter washing their three dogs in the driveway, near the sidewalk.

¶ 51      While sitting on the bottom step of the porch, Sterling's attention was drawn to the van when Julius Davis shouted "on that van," which meant to pay attention to the van. The passenger side of the van was facing the house. Sterling turned around and looked at that van, which had already stopped in front of the house. Then shots began firing from the van. The van's passenger side sliding door was open, allowing Sterling to identify Davionne Whitfield kneeling and shooting. Sterling was unable to obtain a clear view of the person shooting from the front passenger seat, but she was able to observe the driver, whom she identified as defendant. Sterling had known defendant for a couple of years at this point. Sterling then attempted to corral the children, but Andre was already in the process of doing that, so she ran into the house through the front door.

¶ 52    Sterling testified that, later that same evening, she went to the Area 1 Violent Crimes Office in order to talk to some detectives. At around 1 a.m., she viewed a physical lineup, from which she identified Gerald Lauderdale and Davionne Whitfield. However, Sterling identified Lauderdale only because he hangs around with Whitfield, and she made the detective aware of her mistake after she viewed the lineup.

¶ 53    Sterling testified that, on June 26, 2009, she gave a handwritten statement to an ASA. On July 9, 2009, she testified before a grand jury. On August 28, 2009, she returned to Area 1 in order to view another lineup. From this lineup, Sterling identified defendant as the driver of the van.

¶ 54    Upon cross-examination by counsel for defendant, Sterling was shown the statement she had provided to the ASA on the night of June 24, 2009, and Sterling recognized her signature on every page. Counsel for defendant noted that, in the statement, Sterling stated that "she noticed the driver of the van had a gun, but did not recognize who he was." Counsel for defendant and counsel for the State agreed to stipulate that this was indeed in the statement. However, when asked if she had in fact stated this, Sterling testified that she did not. Next, Sterling was asked if she had mentioned defendant's name during her grand jury testimony. Counsel for each side agreed to stipulate that she did not, but Sterling testified that she remembered mentioning his name.

¶ 55    Returning to the events of the shooting, Sterling testified that it was a hot day, and while sitting outside, she was drinking from a pint of Amsterdam Vodka, but added that it "wasn't enough to get me super drunk."

¶ 56    Upon redirect examination by the State, Sterling testified that, right after the shooting, she travelled to the hospital to be with Andre. At Stroger Hospital, Sterling provided a statement to detectives and an ASA while Andre was lying in a bed next to her. She stated that she observed the driver and thought he had a gun. Sterling then testified that, before the grand jury on July 9, 2009, she was never asked about defendant and had not identified defendant at that point.

¶ 57    Upon recross-examination by counsel for defendant, Sterling testified that the first time she mentioned defendant's name to the police was when she visited the police station in August.

¶ 58                                            6. Joe Walker

¶ 59    Joe Walker testified that, on June 24, 2009, he had known Andre Turner for almost 20 years. Walker was at Andre's home on June 24, 2009, at 6:50 p.m., when many people were also present. Walker recalled facing the house and conversing with Andre in the driveway, near the sidewalk, with Andre facing South Stewart Avenue. Andre received a phone call and, approximately at that moment, Walker heard gunshots coming from behind him. Walker was shot in his back and fell in the driveway, where he remained until the paramedics arrived to take him to Stroger Hospital. Since he remained on the ground after he was shot, he was unable to identify anybody in the van.

¶ 60                                        7. Officer Edward Garcia

¶ 61    Officer Edward Garcia testified that he is a Chicago police officer stationed in the Englewood neighborhood. During the evening of June 24, 2009, he was patrolling the Englewood area with his partner, Officer Torres. At 7:20 p.m., Garcia received information over his radio concerning a green van believed to be involved in a shooting earlier that day.

Garcia and his partner found a van matching the radio description in an alley off of South Parnell Street, approximately three blocks from the crime scene. The van was parked on the grass in the alley with its doors open and the engine still running. Garcia observed a man named Christopher Cannon walking away from the van, approximately 50 or 60 feet from the van. Garcia did not observe Cannon or anyone else inside the van. While Garcia and his partner secured the van, another police vehicle transported Cannon to Area 1 around 7:30 p.m.

### 8. Officer John Sanders

Officer John Sanders testified that he was a Chicago police officer assigned to the Englewood police district. On June 24, 2009, at 10:40 p.m., Sanders was on patrol in the area of the 7400 block of Normal Street with his partner, Derrick Patterson, when Sanders noticed multiple people enter a dark colored van at a quick pace and drive off. Sanders was aware of the shooting that had occurred a few hours before.

When the van disobeyed a stop sign, Sanders pulled the van over. As he approached the stopped van, Sanders observed four individuals in the van, including Gerald Lauderdale, who was a known associate of Davionne Whitfield. Sanders observed a bag in the van and what he believed to be a handle of a weapon protruding from it.

Sanders testified that he detained all of the individuals in the van. Lauderdale was transported to Area 1 Violent Crimes Office. A rifle was recovered from the bag that Sanders had observed in the van.

### 9. Officer Nancy DeCook

Officer Nancy DeCook testified that she is a Chicago police officer and forensic investigator. On June 24, 2009, around 7 p.m., she received an assignment at South Stewart Avenue with her partner, John Miller.

On the scene, DeCook observed fired cartridge cases from a .22-caliber rifle in the street in front of Andre Turner's home. She also found two spent .40-caliber cartridges, one at the top landing of the porch and one on top of the steps.

DeCook testified that she recovered two weapons from the scene. First, she recovered a Smith & Wesson .38-caliber revolver from within the barbecue grill under the back porch. Second, she recovered a .40-caliber Kel-Tec semiautomatic weapon from the top of the roof. The firearms and casings were identified, photographed, and inventoried. From the time the evidence was recovered, it was in the sole possession of the Chicago police department.

DeCook testified that she was then directed to Stroger Hospital to photograph and collect evidence from Joe Walker, Andre Turner, and Ricardo Foster.[3] DeCook performed a gunshot residue test on all three men and also collected Walker's clothing.

Upon cross-examination by counsel for Kevin Stanley, DeCook testified that gunshot residue may be washed off one's hands. DeCook did not know whether or not any of the three men had washed their hands or if the hospital had disinfected their hands prior to her

---

[3]Ricardo Foster was one of the men whom eyewitness Donise Robertson identified as the apparent targets of the drive-by shooting. However, Foster did not testify at trial, and the trial did not involve charges concerning him.

administration of the gunshot residue test.

¶ 72                                10. Paul Presnell

¶ 73     Paul Presnell testified that he is a forensic investigator for the Chicago police department and was on duty on June 24, 2009, when he received an assignment to perform a gunshot residue test on Davionne Whitfield at Area 1 Detective Division. Presnell arrived at Area 1 at 10:25 p.m. and performed the test. In addition, Presnell collected Whitfield's shirt to inventory as evidence.

¶ 74                                11. Mike Mazurski

¶ 75     Mike Mazurski testified that he was an evidence technician with the Chicago police department and that he was on duty at 9:46 a.m. on June 25, 2009, when he received an assignment to recover a tote bag containing a handgun and ammunition. The bag was recovered on top of a barbecue grill in the backyard of Andre's residence on South Stewart Avenue. After photographing the tote bag as it appeared at the scene, Mazurski transported the tote bag back to his office. At his office, Mazurski removed all the items and photographed them individually. Afterwards, he inventoried each item.

¶ 76                                12. Aaron Horn

¶ 77     Aaron Horn testified that he was a forensic scientist with the Illinois State Police, specializing in the area of firearms. Horn examined (1) a Serrifile Incorporated Model Terrier One .32-caliber Smith & Wesson revolver, (2) a Smith & Wesson Model 10-5 revolver, (3) a Ruger 10/22 semiautomatic rifle, and (4) a Kel-Tec Model P40 semiautomatic pistol. Horn determined that all four firearms were functional.

¶ 78     Horn testified as follows about the difference between a revolver and a semiautomatic firearm. Revolver cartridges must be manually removed after being discharged. In contrast, a semiautomatic firearm automatically ejects spent cartridges out of the weapon after being discharged. Semiautomatic rifles and pistols work in the same fashion. Though the ejection port on a semiautomatic firearm is supposed to eject the spent cartridge in one direction, Horn testified that, due to numerous variables, there was no reliable way to determine if the cartridge ejects in the same direction every time. Shooter position, type of ammunition used, and the surface the cartridge hits all affect where the spent cartridge ultimately lands.

¶ 79     Horn testified that he examined a fired bullet from the medical examiner's office and determined that the bullet was a .22 caliber and that this bullet could not have been fired from any of the four firearms which he had previously examined.

¶ 80     Horn testified that he determined that all five .22-caliber long rifle casings recovered from South Stewart Avenue were fired from the same firearm. These five .22-caliber long rifle casings could not have been fired from any of the four firearms which he previously examined. Seven other .22-caliber long rifle cartridges were also fired from the same weapon as the previous five .22-caliber cartridges. None of the 12 total .22-caliber cartridges were fired from any of the four firearms examined. Another cartridge casing recovered was a .223 caliber, which could not have been fired from any of the four firearms examined.

¶ 81     Horn testified that two .40-caliber cartridge casings found on the front porch of Andre's home were fired from the same firearm and only the Kel-Tec Model P40 *could* have fired these

cartridges. After further examination, he determined that the two .40-caliber cartridges found at the scene *were* fired from the Kel-Tec.

¶ 82   Horn testified that a carbine is a generalized term for a short-barrel rifle, though there is no specific length requirement. The two .40-caliber cartridges came from the Kel-Tec, but it is possible for the .22-caliber long rifle or .223-caliber cases to have been fired from a carbine type rifle. The .22-caliber cartridge casings could also have been fired from a semiautomatic pistol as well as a revolver designed to fire that caliber. It was possible that the bullet he received from the medical examiner's office could have been fired from a revolver.

¶ 83   Horn testified that bullets typically cannot be compared to casings as "any markings transferred from the casing to the bullet would be obliterated by the time it travels down the barrel." However, bullets can be compared to firearms. Horn opined that, based upon the number of shell casings he examined, there was a minimum of two firearms in this incident and a maximum of three.

¶ 84                     13. Detective Timothy O'Brien

¶ 85   Detective Timothy O'Brien testified that he was a homicide detective with the Chicago police department and was assigned to the Area 1 Detective Division on June 24, 2009, which is the police district where the incident occurred. During the 10 years that he worked as a detective in Area 1, he had personally investigated nearly 1000 murders and shootings. In the course of his investigations, O'Brien worked with other detectives assigned to the area, as well as beat officers and witnesses.

¶ 86   O'Brien testified that he was familiar with the street gangs in the Englewood area. Based on his investigations in Area 1, O'Brien testified that, in June 2009, the Gangster Disciples street gang had control of the 74th Street and Stewart Avenue block and the 75th Street and Normal Street block. However, on June 24, 2009, the Gangster Disciples from these two blocks were not a unified group due to an internal gang conflict.

¶ 87   O'Brien testified that he was on duty at 7:10 p.m. on June 24, 2009, and was assigned to the shooting on South Stewart Avenue with his partner, Michael O'Donnell. While en route to the scene, he received information that three males had been shot and transported to Stroger Hospital and that one young girl had also been shot and transferred to Comer Children's Hospital.

¶ 88   O'Brien testified that, when he arrived at the scene, there was already a heavy police presence and the area was cordoned off from the public with red and yellow crime scene tape. There were two Chicago police department pod security cameras, one at each end of the 7400 block of South Stewart Avenue, and he obtained footage of the pod cameras' recordings. Unfortunately, those recordings were not useful in providing footage of the shooting.

¶ 89   O'Brien testified that he inspected the scene and observed numerous areas of biological and physical evidence. At 8:15 p.m., O'Brien received information from a detective who had been canvassing possible witnesses regarding a potential offender, which he relayed to tactical officer Tom Gorman. After speaking with Gorman, O'Brien learned that the name of the potential offender was Davionne Whitfield.

¶ 90   While on the scene, O'Brien was notified that a van had been recovered at 75th Street and Parnell Street. When O'Brien went to the area, he observed a teal-colored van in the alley with its engine still running. It was obvious that a key was not used to start the van because the

column was removed. O'Brien observed "the passenger sliding door was open and there was numerous expended shell cartridge casing evidence inside the vehicle."

¶ 91    O'Brien testified that, at around 9 p.m. that same evening, he met with Donise Robertson at Area 1 Detective Division in order to show her a photo array. A photograph of Whitfield was included in the six-photograph array. From the array, Robertson identified Whitfield as one of the shooters. O'Brien testified that this photo array was lost after it was placed into a file.

¶ 92    O'Brien testified that he learned that Whitfield had been arrested at approximately 9 p.m. that night and transported to Area 1 for questioning. O'Brien then questioned Whitfield. At approximately 11 p.m. that night, O'Brien requested that forensic investigators administer a gunshot residue test to Whitfield's hands. Since this was around 3½ hours after the shooting, O'Brien admitted that he had no idea if Whitfield had washed his hands or changed his clothes in the meantime.

¶ 93    In addition to Robertson, O'Brien testified that the following witnesses were brought to Area 1 on the night of the shooting: Tawanda Sterling, Dominique Turner, and Christopher Cannon. O'Brien questioned Cannon and released him later that night because Cannon provided an alibi that was corroborated by his mother. O'Brien stated that Cannon was "not a suspect to begin with"; "[h]e was brought in because he was in the vicinity of the vehicle used in the shooting was [*sic*] and he was brought in and then he was subsequently released." Cannon appeared in two lineups but was not identified by any of the witnesses.

¶ 94    Upon cross-examination by counsel for Kevin Stanley, O'Brien testified that during his interview with Donise Robertson, she stated that she had observed Stanley carrying a silver firearm, which O'Brien included in his report.

¶ 95    Upon cross-examination by counsel for defendant, O'Brien testified that, after all of the witness interviews and investigation on the night of the incident, including his interview with Tawanda Sterling at Area 1, he did not know the identity of the driver of the van.

¶ 96                        14. Detective Michael O'Donnell

¶ 97    Detective Michael O'Donnell testified that he was a detective for the Chicago police department assigned to Area 1. On June 24, 2009, he was assigned to investigate a shooting in the 7400 block of South Stewart Avenue with his partner, Detective Timothy O'Brien. O'Donnell viewed the crime scene at Andre's home, as well as the van in the alley off South Parnell Street, before returning to Area 1 to interview witnesses. O'Donnell was present for O'Brien's interview of Donise Robertson. O'Donnell was also present when Robertson viewed the photo array and identified Davionne Whitfield as one of the shooters inside the van.

¶ 98    O'Donnell testified that at 12:09 a.m. on June 25, 2009, he was made aware of Donise Robertson's identification of Kevin Stanley from a photo array conducted by Detective Lutzow. Approximately an hour and a half later, O'Donnell conducted a physical lineup for witness Tawanda Sterling, which included both Davionne Whitfield and Gerald Lauderdale. Sterling identified both Whitfield and Lauderdale, but shortly afterward she changed her identification of Lauderdale, explaining that she had identified him because "he was always with Whitfield and she just assumed he had been one of the people in the van." After Sterling viewed the lineup, Robertson viewed it and identified Whitfield but made no mention of Lauderdale. O'Donnell testified that, when multiple witnesses are present at the police station to view a lineup, the witnesses are kept separate at all times.

¶ 99        O'Donnell testified that, on June 25, 2009, at 4:30 p.m., he conducted a photo array at Area 1 with Deannosha Sharkey. Following the photo array, Sharkey offered to provide a handwritten statement. After he met with Sharkey, O'Donnell testified that investigative alerts were issued for (1) DeShawn Walls, (2) Kevin Stanley, and (3) defendant. Both defense attorneys objected to this portion of O'Donnell's testimony but were overruled.

¶ 100      DeShawn Walls was arrested on June 26, 2009, and subsequently brought to Area 1 where O'Donnell interviewed him. After the interview with Walls, O'Donnell contacted Walls' girlfriend, Krystal Terry, and another woman with respect to the alibi Walls provided. O'Donnell released Walls without charges after Terry traveled to Area 1 for an interview and corroborated the alibi.

¶ 101      O'Donnell testified that he interviewed Julius Davis at Area 1 on July 4, 2009. Following that interview, Davis viewed a photo array and identified defendant as the driver of the van. Davis stated that he observed defendant point a gun and shoot at him as the van fled the scene.

¶ 102      O'Donnell testified that he and O'Brien, along with officers from the gang investigation section and fugitive apprehension section, had been visiting known addresses of Kevin Stanley in order to locate him. Stanley was arrested on August 7, 2009, and included in a physical lineup viewed by Andre Turner and Donise Robertson at Area 1. Andre viewed the lineup first and identified Stanley as the shooter in the front passenger seat of the van. After Andre, Robertson viewed the lineup and also identified Stanley as the shooter in the front passenger seat of the van. O'Donnell testified that, prior to viewing the lineup, Andre and Robertson were kept separate until both had fully completed the viewing process.

¶ 103      O'Donnell testified that, on August 28, 2009, he was notified that defendant was arrested. O'Donnell then conducted physical lineups that included defendant. At approximately 2:30 p.m., Julius Davis was the first person to view this lineup. After viewing the lineup, Davis identified defendant as the driver of the van who shot at Davis. Counsel for defendant objected to this portion of O'Donnell's testimony, but was overruled.

¶ 104      O'Donnell testified that defendant was allowed to choose his position in the lineup before each viewing. When Davis viewed the lineup and made his identification, defendant occupied position four. After that first lineup, defendant chose a different position. The next person to view the lineup was Andre Turner, at 5:25 p.m., and he also identified defendant as the driver of the van. After Andre, Tawanda Sterling viewed the lineup and also identified defendant as the driver of the van. Andre and Sterling were kept separate until both of them completed the lineup viewing process.

¶ 105      O'Donnell testified that he had asked forensic investigator Kathleen Gauhagen to process the van found in the Parnell Street alley and specifically to look for fingerprints. No fingerprints were recovered from the van, including the registered owner's prints. O'Donnell testified that, in his experience, the absence of fingerprints indicated that "the vehicle had either been wiped down or the occupants of the vehicle had covered their hands to prevent leaving fingerprints."

¶ 106      Upon cross-examination by counsel for Kevin Stanley, O'Donnell testified that no fingerprint evidence was found in the van located in the Parnell Street alley, which suggested that the van may have been wiped down in order to erase fingerprints. O'Donnell also testified that he had spoken to a total of four people when he was verifying the alibi provided by Gerald Lauderdale.

¶ 107    Upon cross-examination by counsel for defendant, O'Donnell testified that the first time he had contact with Julius Davis was when Davis was brought to Area 1 by Andre Turner for an interview on July 4, 2009. In addition, O'Donnell testified that, on August 28, 2009, Andre and Tawanda Sterling arrived at Area 1 together to view lineups that included defendant. O'Donnell was aware that Andre and Sterling were in a relationship.

¶ 108                                    15. Lakesha Edwards

¶ 109    Lakesha Edwards testified that Chastity Turner was her youngest child and Andre Turner was Chastity's father. On June 20, 2009, Edwards gave Chastity permission to stay at Andre's house, where she stayed until June 24, 2009. On the morning of June 24, Edwards spoke to Chastity and made plans for Chastity to return home. Edwards testified that later that day, her uncle, Lavelle Johnson, notified her that Chastity had been shot. When she learned that Chastity had been taken to Comers Children's Hospital, Edwards immediately ran to the hospital. Upon her arrival, Edwards was informed that Chastity had died.

¶ 110                          16. Stipulations Introduced by the State

¶ 111    All parties agreed to stipulate that the Secretary of State records showed that, on June 24, 2009, a certain green 1995 Oldsmobile van was owned by an unrelated individual and that, at 6:30 a.m. on June 24, this individual reported her van stolen. This green 1995 Oldsmobile van was the van which the State argued was used in the shooting.

¶ 112    The parties also stipulated that forensic investigator Donald Fanelli photographed the same green 1995 Oldsmobile van and collected eight fired cartridges from inside the van and forwarded them to the Illinois State Police Forensic Services for firearms testing. Fanelli also photographed a second van, which was the van that Lauderdale was stopped in. The parties stipulated that Fanelli recovered the rifle discovered in this second van and that this rifle was inventoried and submitted to Forensic Services for firearms testing. A proper chain of custody was maintained at all times.

¶ 113    The parties also stipulated that, on July 1, 2009, forensic investigator Kathleen Gauhagen processed the 1995 Oldsmobile van,[4] specifically looking for any possible fingerprints and DNA evidence. Gauhagen found no fingerprints inside the van. DNA swabs were taken from various locations inside the van and inventoried with the Chicago police department. Gauhagen also recovered a shell casing from the front passenger seat, which was sent to the Illinois State Police Forensic Services for firearms testing. A proper chain of custody was maintained at all times.

¶ 114    The parties also stipulated that Mary Wong was a forensic scientist employed by the Illinois State Police. On June 25, 2009, Wong received a white T-shirt recovered from Davionne Whitfield, as well as gunshot residue collection kits administered to Davionne Whitfield, Ricardo Foster, Andre Turner, and Joe Walker. Wong analyzed the gunshot residue kits and, with a reasonable degree of scientific certainty, opined that the tests indicated that four individuals may not have discharged a firearm. A proper chain of custody was maintained at all times.

_____
[4]Her stipulation did not note that the van was green or teal.

¶ 115    The parties also stipulated that Nicholas Richert was a forensic scientist employed by the Illinois State Police Division of Forensic Services and qualified as an expert in the field of DNA analysis. On October 6, 2010, Richert received DNA swabs taken by Kathleen Gauhagen on July 1, 2009. Richert examined the DNA swabs and, with a reasonable degree of scientific certainty, opined that no positive associations could be made between the DNA swabs and the DNA profiles of defendant and Kevin Stanley. A proper chain of custody was maintained at all times.

¶ 116    The parties also stipulated that Detective Brian Lutzow was employed by the Chicago police department as a homicide detective assigned to Area 1 Violent Crimes. On June 24, 2009, he was assigned to the shooting investigation of Chastity Turner. He canvassed witnesses at the scene and afterward transported Donise Robertson to Area 1. Lutzow prepared a photo array to show to Robertson. A photo of Kevin Stanley was included in the photo array. From this photo array, Robertson identified Stanley as one of the shooters.

¶ 117                    III. Defense Witness Testimony
¶ 118                    1. Darren Keith Paulk

¶ 119    After the State rested, counsel for Kevin Stanley called Darren Keith Paulk, who testified that he is Stanley's cousin and has known Stanley his entire life. Paulk testified that, on June 24, 2009, he was celebrating the birthday of Erica Stevenson, a friend, when he received a call "from the area saying a little girl got killed." The birthday party occurred on West 59th Street, and Stanley was at the party. Paulk and his cousin, Keyon Taylor, along with a friend named Boo, picked up Stanley between 1 p.m. and 2:30 p.m. and brought Stanley to the party. Paulk picked up Stanley around 85th Street and Wallace Street, near Simeon High School.

¶ 120    Paulk testified that he was living at the house where the birthday party was held, so he was present throughout the entire day. He observed Stanley enter a vehicle and leave the party between 5 p.m. and 6:30 p.m., with Alfonzo Deadwiler and a woman named Nicole. Deadwiler and Nicole's children were also in the vehicle.

¶ 121    Paulk testified that he was convicted of delivery of a controlled substance in 2009. In 2012, he was convicted of possession of a controlled substance, for which he was incarcerated for one year in the Department of Corrections.

¶ 122    Upon cross-examination by the State, Paulk testified that, in January or February 2010, he learned that Stanley had been arrested for murder after a family member told him about it, but he did not remember which family member. Paulk never knew Chastity. Paulk also was never told what day the murder occurred. However, since he recalled hearing about a girl being killed in the Englewood area, he linked that to the day of the birthday party.

¶ 123    Paulk testified that he did not attempt to contact the authorities in 2010 to relay the information that Stanley was with him on June 24, 2009. However, he provided this information to the police on August 8, 2011. He was not contacted by the police prior to August 8, 2011, regarding Stanley's involvement in the shooting. During his meeting with a State investigator on August 8, Paulk stated that he did not remember the exact date in question. Paulk told the investigator that he observed Stanley at the birthday party up until 5 p.m. Paulk next spoke to a defense investigator on December 20, 2013, and stated that he observed Stanley at the party until 6:45 p.m. Paulk testified that he was not sure of the time, but believed his observation of Stanley at the party fell between 5 p.m. and 6:45 p.m.

¶ 124    Paulk testified that he had never spoken with Stanley regarding the murder charge or about this alibi. Paulk did previously discuss the alibi twice with counsel for Stanley and with other witnesses present at the birthday party.

¶ 125                                    2. Keyon Taylor

¶ 126    Next, counsel for Kevin Stanley called Keyon Taylor, who testified that he was a friend of Stanley and had known him for 16 years. In June 2009, Taylor was at a barbecue and birthday party for Erica Stevenson, who is the mother of Taylor's two daughters. Taylor's uncle, Herman Payton, told him that evening about the shooting, and he recalled that party specifically because it was the same day as the shooting. Taylor testified that he received this call sometime in the evening.

¶ 127    Taylor testified that there were many people at the party, including Stanley, whom Taylor picked up with Darren Paulk and "Boo." Taylor picked up Stanley at about 1:30 p.m. near 81st Street and Wallace Street and drove to the party. Taylor was at the party throughout the day and observed Stanley leave the party with Alfonzo Deadwiler, Deadwiler's wife Nicole, and their kids around 5 p.m. or 5:30 p.m. Stanley did not return to the party after he left.

¶ 128    Taylor testified that, on August 8, 2011, he spoke with a State's Attorney investigator. He was not contacted by the police before August 8. Taylor also testified that he was convicted of felony aggravated unlawful use of a weapon in 2008, for which he received probation for two years.

¶ 129    Upon cross-examination by the State, Taylor testified that he learned from a friend that Stanley was arrested on the day it happened and then later said that he learned of Stanley's arrest a week or two afterwards. Taylor did not learn what Stanley was arrested for until investigators spoke with him a few months after Stanley's arrest. He knew that the murder occurred on the day of the birthday party because he remembered being at the party when his uncle called him and told him about the murder. Taylor never contacted authorities regarding this alibi.

¶ 130                                    3. Alfonzo Deadwiler

¶ 131    Counsel for Kevin Stanley called Alfonzo Deadwiler, who testified that he had known Stanley for six years and had met him through Keyon Taylor and Darren Paulk. In June 2009, Deadwiler's mother, Carolyn Lowe, threw a barbecue for Erica Stevenson at her house. Stevenson's birthday was June 24. Deadwiler arrived at the party around 2:30 p.m. or 2:45 p.m., and Stanley arrived shortly after with Paulk and Taylor, who had driven Stanley to the party. Deadwiler was at the party throughout the day, and Stanley never left while Deadwiler was there. Deadwiler left the party between 6:30 p.m. and 7 p.m. with his wife, Nicole, their children, and Stanley, and they all traveled to Deadwiler's home in East Chicago, Indiana. The drive took approximately 25 to 30 minutes. After they arrived at Deadwiler's home, Deadwiler and Stanley stayed at the house, drinking and watching television. Stanley stayed the night at Deadwiler's home.

¶ 132    Deadwiler testified that he spoke with Stanley's counsel a couple of months after Stanley was incarcerated. Deadwiler also testified that he spoke with an investigator from the State's Attorney's Office on September 20, 2011.

¶ 133    Upon cross-examination by the State, Deadwiler testified that, when he spoke with a State investigator on September 20, 2011, he did not remember the exact day in question but believed the date to have been "the 23rd, 24th, or the 25th." Deadwiler also testified that he was with Stanley on the day he was arrested but dropped him off just before the arrest. Deadwiler learned the next morning from his mother that Stanley had been arrested and was told that Stanley had been arrested for sitting in front of an abandoned building. Deadwiler did not learn that Stanley was arrested for murder until a couple of days afterwards.

¶ 134    Deadwiler testified that he remembered this particular barbecue because he had just moved from Wisconsin to East Chicago, Indiana, and he went to his mother's house only for special occasions, and this birthday party was one of them. In August or September 2010, Deadwiler learned that Stanley was charged with the murder of Chastity Turner when he spoke with Stanley's lawyer. Deadwiler testified that he had not spoken with Stanley or any other witnesses regarding this alibi. Deadwiler never contacted the authorities regarding this alibi.

¶ 135                              4. Sergeant John Nowakowski

¶ 136    Next, counsel for Kevin Stanley called Sergeant John Nowakowski, who testified that he was employed by the Chicago police department and that he met with Andre Turner at Stroger Hospital the day after the shooting. Andre told Nowakowski that he knew the occupants of the van and had also been told their names.

¶ 137    Upon cross-examination by the State, Nowakowski testified that Andre did not reveal their names to him. Nowakowski believed that Andre was still upset with the police at this time.

¶ 138    All parties agreed to stipulate that Kim Taylor worked as an investigator for Whitfield's counsel on December 8, 2010, and that, if Kim Taylor were to testify, she would state that in her capacity as an investigator, she spoke with Andre Turner, who told her that the backseat passenger was either DeShawn Walls or "Pistol Pete."

¶ 139                              IV. Jury Instructions

¶ 140    After all the parties rested, a jury instruction conference was held off the record. Since the conference was held off the record, we do not know what the parties or the court discussed during it. However, on the next day of trial, the trial court read the results of the conference on the record. Since defendant challenges several of the jury instructions on appeal, we provide here a detailed description of the trial court's ruling.

¶ 141    The trial court indicated that counsel for defendant had objected to the circumstantial evidence instruction offered by the State on the ground that it was poorly worded and confusing. The court read the instruction on the record as follows:

> "Circumstantial evidence is the proof of facts or circumstances which give rise to a reasonable inference of other facts which tend to show the guilt or innocence of the defendant. Circumstantial evidence should be considered by you together with all the other evidence in the case in arriving at your verdict."

This is also verbatim how the pattern jury instruction is worded. Illinois Pattern Jury Instructions, Criminal, No. 3.02 (4th ed. 2000) (hereinafter, IPI Criminal 4th). Defense counsel did not offer an alternative instruction, and the trial court overruled the defense's objection. The defense also objected to IPI Criminal 4th Nos. 6.07X and 7.02 offered by the State, the

instructions for attempted first degree murder and first degree murder, respectively, on the ground that they were confusing.

¶ 142    Specifically, counsel objected to the language at the end of the fourth and fifth paragraphs of each instruction that stated "you should find *the* defendant guilty" or "you should find *the* defendant not guilty." (Emphases added.) IPI Criminal 4th Nos. 6.07X, 7.02. Since there were two defendants at trial, the defense argued that the instruction suggested that "if you find for one, you could find for the other." Counsel argued that the phrase "the defendant" in the two sentences should be changed to "that defendant" in order to indicate a difference between the two defendants. The trial court overruled the objection, stating (1) that the word "that" would have to refer back to something and there was nothing for "that" to refer back to and (2) that one of the initial instructions was that each defendant should be considered separately by the jury.

¶ 143                                    V. Closing Arguments

¶ 144    On appeal, defendant claims that the State engaged in prosecutorial misconduct throughout the State's closing argument. Thus, we describe the parties' closing arguments, focusing on the remarks challenged on appeal.

¶ 145    In its initial closing argument, the State described the gang disputes that occurred in the Englewood neighborhood between the two rival factions and how they culminated in the death of Chastity Turner. The State's primary argument concerning defendant focused on the eyewitness testimony which corroborated their respective accounts and identified defendant as the driver. Julius Davis identified defendant as the driver, which was later corroborated by Andre Turner. In addition, Tawanda Sterling identified defendant as the driver. The State emphasized that these identifications were significant since all three people knew defendant.

¶ 146    The State also detailed the thoroughness of the police investigation. The State argued that the police did everything that they could possibly do regarding the recovered evidence. In addition, they recovered several guns and other evidence and investigated persons of interest and eliminated them as suspects once they had proper grounds. The State discussed Gerald Lauderdale and how he was brought in by the police but not positively identified by any of the witnesses. Lauderdale had a gun when he was arrested, and the State opined that "Lauderdale had this gun because why? He's either getting out of town. He's getting out of town because you know what, some bad stuff happened on Stewart that evening. *** Getting out of town, got to have something to defend himself because there's going to be hell to pay." Counsel for defendant objected but was overruled by the trial court.

¶ 147    In his closing argument, counsel for defendant argued that the identifying witnesses were unreliable and had a motive to collude in their identifications. Andre Turner was physically turned around for part of the time when the van pulled up. He was distracted. His identification of defendant "happened in a fleeting second or seconds through the front window of the van" and Andre had a problem with defendant. Tawanda Sterling spoke with police on June 24, but did not mention defendant's name. The first time she told authorities that she knew the identity of the driver was on August 28 when Andre brought her to the police station. Also, she was drinking when the incident occurred, which counsel argued affected her ability to observe. Julius Davis made his identification of defendant while hiding behind a tree to protect himself from gunfire. Counsel argued that Davis's judgment was off because he left the cover of the

- 18 -

tree to hide behind a bush when a tree provides better cover. Counsel stated that "he's ducking, he's running, he's not seeing."

¶ 148    In its rebuttal closing argument, the State characterized defendant's argument as speculative. The State argued that the defense's arguments were "not based on any admissible evidence, not based on the evidence you heard, and basically not supported by the law." The State argued that the identifying witnesses were all credible. Andre was credible because he testified that he was a "drug-dealing gang member" and could not deny that fact in the future since it was recorded. Julius Davis was credible because he would likely be labeled as a "gang snitch" for providing his testimony and would now have to fear retaliation from Gargamel, defendant's brother. Tawanda Sterling and Donise Robertson were credible because "they violated rule number one of the street, they didn't stop snitching."

¶ 149    Responding to the defense argument that the identifying witnesses were mistaken, the State argued: "All four main witnesses misidentified the same three defendants. What are the chances of that?" The State argued that this was impossible.

¶ 150    The State argued that the defense's tactic regarding the identifying witnesses was to "deny, deflect, and offer a disingenuous defense." The trial court sustained counsel for defendant's objection when the State characterized the defense's argument as "when everything is against you, you just come up with stuff. Collusion." The State later argued that the theory that this was a conspiracy of which Andre was the "puppeteer" was "another big pile of hooey." The State argued that it would have to be Donise Robertson, not Andre, who was at the center of any conspiracy because she made identifications to the police at the crime scene while Andre was at the hospital:

> "I mean, picture the scene. It's ridiculous. Picture the scene. Grandma Donise out there, everyone gather around, get those dogs, get them to stop crying, I'll be in shock. Gather around. I know we're all sorry about Chastity. But you know what, Ronald and the boys, they've been crowding in on my baby-sitting business and this is a great time for us to set up a conspiracy against them. Now, Tawanda, you run along and you let Andre know this is what we're gonna do. We're gonna put Old Ronnie in the van, Kevin in the van, [Whitfield] in the van. This is where they're gonna be. Run off, let me know, so we all get together. It's ridiculous. It's ridiculous."

¶ 151    The State argued against the reliability of the alibi witnesses provided by Kevin Stanley, arguing: "Remember every alibi has a little bit of a lie in it, and this one has a lot of lie." The State stressed that the alibi witnesses were not certain of dates, did not visit Stanley in prison, and did not contact authorities to tell them about the alibi. The State also observed that counsel for Kevin Stanley did not offer further evidence to corroborate the testimony of the alibi witnesses. The State argued that Stanley's alibi witnesses were not believable: "They have a constitutional right to get up there and tell you the biggest bunch of garbage that they can come up with, and that's exactly what they did, ladies and gentlemen." Later, the State argued: "Those alibi witnesses might as well have been Elvis, the Easter Bunny, and Santa Clause [sic] for the amount of credibility they had and they want you to rely on that testimony in setting them free." The trial court sustained counsel for defendant's objection but only as to the word "them."

¶ 152                           VI. Jury Verdict and Sentencing

¶ 153     The jury found defendant guilty of all counts, and on May 7, 2014, counsel for defendant filed a posttrial motion for a new trial. Defendant argued that the State failed to prove his guilt beyond a reasonable doubt and that he was denied due process when the trial court overruled objections to several arguments made by the State during its rebuttal closing argument. On July 9, 2014, the trial court denied the motion.

¶ 154     On July 9, 2014, the trial court sentenced defendant to 50 years for the first degree murder of Chastity Turner, 25 years for the attempted first degree murder of Joe Walker, and 25 years for the attempted first degree murder of Andre Turner. These sentences were to be served consecutively for a total of 100 years.

¶ 155     On July 9, 2014, defendant filed a timely notice of appeal, and this appeal followed.

¶ 156                                        ANALYSIS

¶ 157     On this appeal, defendant claims (1) that the State failed to prove defendant guilty beyond a reasonable doubt, (2) that the trial court erred by allowing testimony by a police officer that he issued an investigative alert for defendant's arrest after a photo array and statement by a witness who did not testify at trial, (3) that defendant was denied a fair trial when the State was permitted to introduce evidence of allegedly unrelated guns and other allegedly unrelated information, (4) that defendant was denied a fair trial by being tried jointly with codefendant Kevin Stanley when the evidence against Stanley was allegedly greater, (5) that defendant was denied a fair trial by allegedly inaccurate or misleading jury instructions, and (6) that the State committed prosecutorial misconduct during its closing arguments.

¶ 158     For the following reasons, we affirm defendant's conviction.

¶ 159                                I. Sufficiency of the Evidence

¶ 160     First, defendant argues that the State's evidence was insufficient. Although three occurrence eyewitnesses identified defendant as the driver of the van and all three witnesses knew defendant prior to the shooting, defendant argues that the State's evidence was insufficient because these witnesses did not identify him until a week or more after the shooting, they had limited opportunities to view the driver, and they had a motive to fabricate since defendant belonged to a rival gang faction.

¶ 161     When assessing a challenge to the sufficiency of the evidence, a court considers " 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis omitted.) *People v. Collins*, 106 Ill. 2d 237, 261 (1985) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). If we find that the evidence meets this standard, we must affirm the conviction (*People v. Herrett*, 137 Ill. 2d 195, 203 (1990)); we will not retry the defendant (*People v. Beauchamp*, 241 Ill. 2d 1, 8 (2011); *People v. Wheeler*, 226 Ill. 2d 92, 114 (2007); *People v. Smith*, 185 Ill. 2d 532, 541 (1999)).

¶ 162     On review, this court must consider all the evidence in the light most favorable to the State (*Collins*, 106 Ill. 2d at 261), and we will not substitute our judgment for that of the trier of fact unless the sufficiency of the evidence is so improbable, unsatisfactory, or unreasonable that it justifies a reasonable doubt of defendant's guilt (*Wheeler*, 226 Ill. 2d at 115; *Smith*, 185 Ill. 2d at 541).

¶ 163    As we observed, three eyewitnesses identified defendant as the driver of the van during the June 24, 2009, shooting. First, Andre Turner testified that he had known defendant for 10 or 11 years and that, as the van approached, Andre was able to observe the front of the van and could identify defendant as its driver. Andre testified that he later viewed a lineup on August 28, 2009, and identified defendant as the driver. Defense counsel cross-examined Andre about his lack of cooperation with the police immediately after the shooting and about his ability to view the van's driver. Andre testified that his view of the driver was not obstructed by any glare from sunlight and that he had informed the ASA in his statement on August 7, 2009, that defendant was the driver.

¶ 164    Second, Julius Davis testified that he had known defendant for six or seven years and that, as the van was driving away from Andre's house, defendant shot at Davis from the driver's side. Defense counsel also cross-examined Davis about his opportunity to view, and Davis admitted that the whole incident lasted a few seconds and that, during the incident, Davis was trying to duck behind a tree and then some bushes to avoid being shot.

¶ 165    Third, Tawanda Sterling testified that, although she was unable to obtain a clear view of the person shooting from the front passenger seat, she was able to observe the driver, whom she identified as defendant. She testified that she had known defendant for a couple of years. Defense counsel cross-examined Sterling about the fact that she had provided a statement to the ASA on June 24, 2009, and that, in that statement, she had stated that "she noticed the driver of the van had a gun, but did not recognize who he was."

¶ 166    The witnesses' delay in identification and their ability to view were explored by defense counsel on cross-examination, and the jury was able to weigh their answers. A jury's findings are accorded great weight because the jurors observed and heard the witnesses firsthand, and thus, the jurors are best equipped to determine the witnesses' credibility, weigh their testimony, draw reasonable inferences from the evidence, and ultimately choose among conflicting accounts of events. See *Wheeler*, 226 Ill. 2d at 114-15; *Smith*, 185 Ill. 2d at 541-42; *People v. Williams*, 193 Ill. 2d 306, 338 (2000).

¶ 167    Defendant also argues that the witnesses had a motive to lie in their identification of defendant since he was a rival gang member. However, the witnesses, who were all targets of the drive-by shooting, also had every motive to see the real culprits brought to justice. The victims would not want to leave the real culprits on the street free to try again another day. In addition, the claimed motive for fabrication was also the motive for the shooting itself. By defendant's logic, the same rivalry which motivated a drive-by shooting would also always serve as a motive to fabricate an identification. Lastly, defendant's membership in a rival gang faction was a fact that was presented and weighed by the jury.

¶ 168    As a result, considering the evidence in the light most favorable to the State, as we must, we cannot find that the evidence against defendant was insufficient to identify him as the driver of the van, as he argues on appeal.

¶ 169                    II. Hearsay Evidence From Detective O'Donnell

¶ 170    Second, defendant argues that the trial court erred by allowing hearsay testimony by a police officer that he issued an investigative alert for defendant's arrest after conducting a photo array and receiving a statement from a witness who did not testify at trial.

- 21 -

¶ 171    Detective Michael O'Donnell testified that, on June 24, 2009, the day of the shooting, he viewed both the crime scene and the van and then returned to Area 1, where he was present for the interview with Donise Robertson and her identification of Davionne Whitfield from a photo array. He testified that, shortly after midnight on June 25, he was informed that Robertson had also identified codefendant Kevin Stanley from a photo array. O'Donnell then conducted physical lineups from which Tawanda Sterling and Robertson separately identified Whitfield. Both Sterling and Robertson testified at trial.

¶ 172    Detective Michael O'Donnell testified that, at 4:30 p.m. on June 25, 2009, he conducted a photo array with Deannosha Sharkey and that, after viewing the photo array, Sharkey also provided a statement. O'Donnell testified that he then issued an investigative alert for three individuals: (1) defendant, (2) DeShawn Walls, and (3) codefendant Kevin Stanley. O'Donnell testified that an investigative alert warns an officer that the subject is "considered dangerous" and that "they're wanted in this case for the homicide and that they are to be arrested and brought to Area 1 for that purpose." Sharkey did not testify at trial, and codefendant's counsel objected to this portion of O'Donnell's testimony. When codefendant's counsel asked to approach the bench, the trial court asked if he wanted the court reporter present, and he replied no. As a result, the discussion by the trial court and the attorneys concerning the objection was held off the record. Back on the record, defendant's counsel stated that he joined the objection on the "[b]asis of hearsay," and the trial court stated that their objections were overruled.

¶ 173    On appeal, defendant argues that the admission of O'Donnell's testimony regarding Sharkey was prejudicial since the other three identifications against him were weak and that its admission also violated his sixth amendment right to confront the witnesses against him. *People v. Whitfield*, 2014 IL App (1st) 123135, ¶ 25 ("a defendant is guaranteed the right to confront witnesses against him by the confrontation clause of both the United States and Illinois Constitutions"); U.S. Const., amend. VI; Ill. Const. 1970, art. I, § 8.

¶ 174    In response, the State argues that this portion of the detective's testimony was not hearsay because it was admitted to show the steps of the officer's investigation rather than for the truth of the matter asserted and that, even if this testimony was hearsay and was admitted in error, any alleged error was harmless. In addition, the State argues that, since the testimony was not hearsay, the confrontation clause does not apply. *Crawford v. Washington*, 541 U.S. 36, 59 n.9 (2004) ("The [Confrontation] Clause also does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted.").

¶ 175    Hearsay is an out-of-court statement that is offered to prove the truth of the matter asserted. *People v. Edgecombe*, 317 Ill. App. 3d 615, 627 (2000). When hearsay is excluded from evidence, it is "primarily because of the lack of an opportunity to cross-examine the declarant." *People v. Whitfield*, 2014 IL App (1st) 123135, ¶ 25. When hearsay is admitted into evidence pursuant to some exception to the rule against hearsay, the value of the statement depends on the credibility of the out-of-court declarant. *Edgecombe*, 317 Ill. App. 3d at 627.

¶ 176    However, an out-of-court statement that is offered for a purpose *other than* to prove the truth of the matter asserted is *not* hearsay in the first place, and thus it does not implicate the confrontation clause. *Whitfield*, 2014 IL App (1st) 123135, ¶ 25.

¶ 177    When a police officer recounts the steps of his or her investigation for the limited purpose of showing only the course of the investigation, that testimony is not hearsay because it is not being offered for its truth. *Whitfield*, 2014 IL App (1st) 123135, ¶ 25. Although courts sometimes loosely refer to this type of statement as an "exception" to the rule against hearsay

(*Edgecombe*, 317 Ill. App. 3d at 627), this type of statement is not an exception, but rather it is not hearsay in the first place. See *Whitfield*, 2014 IL App (1st) 123135, ¶ 25.

¶ 178    A police officer may recount the steps taken in the investigation of a crime and may describe the events leading up to the defendant's arrest only " ' "where such testimony is necessary and important" ' " to the jury's comprehension of the State's case. *Edgecombe*, 317 Ill. App. 3d at 627 (quoting *People v. Warlick*, 302 Ill. App. 3d 595, 598-99 (1998), quoting *People v. Simms*, 143 Ill. 2d 154, 174 (1991)); see also *Whitfield*, 2014 IL App (1st) 123135, ¶ 25 (admissible only "where such testimony is necessary to fully explain the State's case to the trier of fact"). The police officer may not testify to information beyond what is necessary to explain the officer's actions. *Edgecombe*, 317 Ill. App. 3d at 627; *People v. Hunley*, 313 Ill. App. 3d 16, 33 (2000). The State may not use this "limited investigatory procedure" to place into evidence the substance of any out-of-court statement that the officer hears during his investigation but may elicit only the substance of a conversation to establish the police investigative process. *Edgecombe*, 317 Ill. App. 3d at 627; *Hunley*, 313 Ill. App. 3d at 33-34.

¶ 179    The admission of such police investigative testimony is usually within the sound discretion of the trial court, and a reviewing court will generally not reverse a trial court absent an abuse of discretion. *Whitfield*, 2014 IL App (1st) 123135, ¶ 25; see also *People v. Ciborowski*, 2016 IL App (1st) 143352, ¶ 88 (speaking of evidentiary rulings in general). An abuse of discretion occurs where the trial court's decision is arbitrary, fanciful, or unreasonable or where no reasonable person would agree with the position adopted by the trial court. *Ciborowski*, 2016 IL App (1st) 143352, ¶ 88.

¶ 180    However, defendant argues on appeal that the issue of whether a defendant's constitutional right of confrontation was violated is reviewed *de novo*, since the issue does not involve disputed facts. In support, defendant cites *People v. Leach*, 2012 IL 111534, ¶ 64, in which our supreme court applied a *de novo* standard of review to the question of whether the admission of an autopsy report, without the author's appearance at trial, violated a defendant's right of confrontation. In *Leach*, the facts were undisputed. The declarant's statement, *i.e.*, the report, and the attorney's objections at trial were before the supreme court.[5] By contrast, in the case at bar, the declarant's actual statement—namely, the statement by Sharkey—is not before us, nor is the discussion by the attorneys concerning their objections. What the parties are arguing about on appeal are the possible inferences which the jury might have drawn from O'Donnell's testimony. Thus, in this case, an abuse of discretion standard makes more sense since we, as an appellate court, are reviewing a cold record, and we do not even know the explanation of the objection offered by defense counsel or the reasons given by the trial court for its ruling. However, under either a *de novo* or abuse of discretion standard, our ultimate conclusion is the same, as we explain below.

¶ 181    Even when admission of this type of testimony is in error, the error is subject to harmless error analysis. The error does not require reversal under either the rule against hearsay or the confrontation clause if the error was harmless beyond a reasonable doubt. *People v. Stechly*, 225 Ill. 2d 246, 304 (2007) (citing *People v. Patterson*, 217 Ill. 2d 407, 427-28 (2005)). "The

---

[5]In *Leach*, defendant filed a motion *in limine*, and the trial court held a pretrial hearing on the issue. The supreme court quoted the parties' arguments from both their filings and the pretrial hearing. *Leach*, 2012 IL 111534, ¶¶ 4-5.

test is whether it appears beyond a reasonable doubt that the error at issue did not contribute to the verdict obtained." *Stechly*, 225 Ill. 2d at 304 (citing *Patterson*, 217 Ill. 2d at 428).

¶ 182    In the case at bar, the jurors could have reasonably inferred, by a process of elimination, that it was Sharkey who had identified defendant. First, of the three eyewitnesses who identified defendant at trial, none had identified him by June 25, 2009, when O'Donnell issued the investigative alert. Andre Turner testified that he initially refused to cooperate with the police and that he did not identify defendant as the driver until August 2009. Julius Davis testified that he identified defendant in July 2009, and Tawanda Sterling testified that the first time she mentioned defendant's name to the police was in August 2009. Thus, the jurors knew that none of the testifying witnesses had identified defendant before O'Donnell issued his alert for defendant on June 25, 2009. Second, Detective O'Brien testified that Whitfield had been arrested at 9 p.m. on June 24, 2009, and transported to Area 1 for questioning. However O'Brien also testified that, after all the witness interviews and investigations on the night of June 24, he still did not know who the driver was. Thus, based on all this information, the jury could have reasonably inferred that Sharkey, who was interviewed during the late afternoon on June 25, 2009, was the person who provided the identification which led to O'Donnell's subsequent alert for defendant.

¶ 183    However, we still cannot say that the trial court abused its discretion by admitting this testimony as a description of the police investigative process. First, O'Donnell was recounting the steps that he had taken in the immediate aftermath of the shooting, and this was one of the steps. Second, O'Donnell issued an alert for three different individuals; thus Sharkey's statement could have concerned any one of the three and not necessarily defendant. Third, Detective O'Brien testified that he was familiar with the street gangs in the Englewood area and that, in June 2009, there was an internal gang conflict between the Gangster Disciples from two different blocks. O'Brien, who was O'Donnell's partner, testified that his knowledge was based on his 10 years of experience during which he had investigated nearly 1000 murders and shootings in Englewood. Thus, the jury could have also reasonably inferred that it was O'Brien's expertise and knowledge which had provided the basis for a motive and made defendant a suspect. Third, as a general rule, "[w]here the content of the nontestifying witness's statement is not revealed, the mere fact that the jury could infer" the fact that "something the nontestifying witness said caused the police to suspect the defendant" does not necessarily mean "that the defendant has the right to cross-examine the nontestifying witness." *People v. Alvarez*, 344 Ill. App. 3d 179, 188 (2003).

¶ 184    Even if the trial court abused its discretion by admitting O'Donnell's testimony about Sharkey as part of the police investigative process, or even if a *de novo* standard applies, we must find that any error was harmless. The claimed error, with respect to a fourth identification received by the police, was harmless in light of the three eyewitness identifications that were presented and subjected to cross-examination at trial. As we observed above, "[t]he test is whether it appears beyond a reasonable doubt that the error at issue did not contribute to the verdict obtained." *Stechly*, 225 Ill. 2d at 304 (citing *Patterson*, 217 Ill. 2d at 428). In light of the three eyewitness identifications of defendant, which were all subjected to cross-examination and which were uncontradicted at trial, it appears beyond a reasonable doubt that any error with respect to an additional fourth identification received by the police did not contribute to the verdict obtained. For these reasons, we do find this claim persuasive.

III. Admission of Guns and Other Evidence

¶ 186    Third, defendant claims that he was denied a fair trial by the admission of (1) evidence showing that the State arrested Christopher Cannon and Gerald Lauderdale and then determined that they were not involved in the shooting and (2) evidence of gangs, guns, and bad associates.

¶ 187    "A criminal defendant, whether guilty or innocent, is entitled to a fair, orderly, and impartial trial conducted according to law." (Internal quotation marks omitted.) *People v. Blue*, 189 Ill. 2d 99, 138 (2000). This right to due process is guaranteed by both the federal and state constitutions. *Blue*, 189 Ill. 2d at 138; U.S. Const., amend. XIV, § 1; Ill. Const. 1970, art. I, § 2. Due process requires that a defendant's guilt may be proved only by legal and competent evidence, uninfluenced by the bias or prejudice that can be raised by irrelevant evidence. *Blue*, 189 Ill. 2d at 129.

¶ 188    " 'Evidence is relevant if it tends to prove a fact in controversy or render a matter in issue more or less probable.' " *People v. Wilcox*, 407 Ill. App. 3d 151, 169 (2010) (quoting *People v. Nelson*, 235 Ill. 2d 386, 432 (2009)); Ill. R. Evid. 401 (eff. Jan. 1, 2011). In addition, even when evidence is relevant, a trial court may exercise its discretion to exclude it " 'if its prejudicial effect substantially outweighs its probative value.' " *Wilcox*, 407 Ill. App. 3d at 169 (quoting *People v. Walker*, 211 Ill. 2d 317, 337 (2004)); Ill. R. Evid. 403 (eff. Jan. 1, 2011). Defendant argues both that evidence was irrelevant (Ill. R. Evid. 401 (eff. Jan. 1, 2011)) and that, even if it was relevant, it should have been excluded as prejudicial (Ill. R. Evid. 403 (eff. Jan. 1, 2011)).

¶ 189    Defendant argues, first, that the State used evidence concerning the investigation and release of Cannon and Lauderdale in order to bolster its case against defendant by showing that it had conducted a thorough investigation. Defendant argues that this evidence should have been barred as not relevant to the State's prosecution of defendant. This is a situation where the State is confounded if it does not and confounded if it does. If the State had failed to show that it had thoroughly investigated Cannon and Lauderdale before excluding them as suspects, then the defense would have argued that the State had failed to investigate two viable, alternative suspects. See, *e.g.*, *Alvarez*, 344 Ill. App. 3d at 187 (defendant claimed that he was denied a fair trial when he was prevented from showing that the police had investigated other suspects prior to his arrest). As a result, we do not find this argument persuasive.

¶ 190    Defendant argues, second, that the State's introduction of evidence concerning gangs and bad associates was both irrelevant and highly prejudicial, and he cites in support *People v. Decaluwe*, 405 Ill. App. 3d 256, 268 (2010), in which this court found that it was error to admit evidence where "the State has not advanced a reasonable explanation regarding how the [exhibits] were relevant to the crime charged."

¶ 191    In the case at bar, the State's theory of the case was that this was a drive-by shooting motivated by an internal gang conflict between two warring factions of the same gang. As a result, the different gang memberships and associates of both the victims and the accused were relevant to proving the State's case.

¶ 192    Defendant argues, lastly, that the trial court erred by admitting evidence of four guns that were shown by the State to be either not involved in the shooting or not connected to defendant. The four guns were two guns recovered from victim Andre Turner's property, which was also the crime scene; one gun recovered from a van in which Lauderdale, an initial

suspect, was riding; and one gun recovered from a different residence on Andre Turner's block.

¶ 193    The State's ballistics evidence showed (1) that the bullet recovered during the autopsy from Chastity Turner's body was a .22-caliber bullet; (2) that twelve .22-caliber cartridge casings were recovered from the street in front of Andre Turner's house; (3) that neither the bullet nor the casings were fired from the four guns (listed above); and (4) that two .40-caliber cartridge casings, found near Andre Turner's front porch, were fired from the Kel-Tec semiautomatic pistol found on top of his roof.

¶ 194    Defendant admits that he waived this issue for appeal by failing to object at trial and asks us either to consider the issue under the plain error doctrine (*People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007)), or to consider his failure to object as ineffective assistance of his trial counsel (*Strickland v. Washington*, 466 U.S. 668, 686 (1984)).

¶ 195    The plain error doctrine allows a reviewing court to consider an unpreserved error when "(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *Piatkowski*, 225 Ill. 2d at 565.

¶ 196    Under *Strickland*, to prevail on a claim of ineffective assistance of counsel, a defendant must show both (1) that his counsel's performance was objectively unreasonable under prevailing professional norms and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *In re Edgar C.*, 2014 IL App (1st) 141703, ¶¶ 77-78 (citing *People v. Domagala*, 2013 IL 113688, ¶ 36). See also *Strickland*, 466 U.S. at 687.

¶ 197    Under either theory, we must determine whether any error occurred. Under the plain error doctrine, "the first step" is to determine whether any error occurred at all. *Piatkowski*, 225 Ill. 2d at 565. Similarly, to succeed on a claim of ineffective assistance of counsel, defendant must show errors by counsel that were so "serious" that counsel cannot be said to have been "functioning" as counsel. *Strickland*, 466 U.S. at 687. Under either theory, defendant must show that the admission of this evidence constituted a clear error that counsel should have objected to.

¶ 198    In the case at bar, if the State had not presented these four guns in its case-in-chief, and defendant had then introduced evidence of the seizure of all these guns from the crime scene or from a nearby residence or from another suspect, it would have looked as though the State had something to hide. Considering the proximity of these guns to either the crime scene or a possible suspect, it was reasonable for the State to try to rule them out as the murder weapon both during the unfolding investigation and before the jury. Since we cannot find any error, the issue does not implicate either the plain error doctrine or suggest ineffectiveness on the part of trial counsel for not objecting.

¶ 199                              IV. Joint Trial with Codefendant Kevin Stanley

¶ 200    Defendant argues that he was denied a fair trial by being tried jointly with codefendant Kevin Stanley.

¶ 201    The trial court has broad discretion in deciding whether or not to sever codefendants for trial, and as a reviewing court, we will affirm, unless that decision constitutes an abuse of discretion. *People v. Fleming*, 2014 IL App (1st) 113004, ¶ 38. An abuse of discretion occurs where the trial court's decision is arbitrary, fanciful, or unreasonable or where no reasonable person would agree with the position adopted by the trial court. *Ciborowski*, 2016 IL App (1st) 143352, ¶ 88.

¶ 202    A defendant does not have a right to be tried separately from his codefendants when charged with an offense arising out of a common occurrence. *People v. Leak*, 398 Ill. App. 3d 798, 829 (2010) (citing *People v. Ruiz*, 94 Ill. 2d 245 257 (1982)); *People v. Byron*, 116 Ill. 2d 81, 92 (1987) ("There is no automatic right to be tried separately from one's codefendants."). With severance, the primary questions are whether the defenses of the respective defendants are so antagonistic to each other that they could not receive a fair trial without a severance (*Leak*, 398 Ill. App. 3d at 830; *Byron*, 116 Ill. 2d at 92) and whether the statement of a nontestifying codefendant will implicate defendant. *People v. James*, 348 Ill. App. 3d 498, 507 (2004) ("severance is necessary when one defendant has made out-of-court admissions that implicate a codefendant"); *Bruton v. United States*, 391 U.S. 123, 137 (1968) (the admission of a statement at a joint trial by a nontestifying codefendant that implicates the defendant in the crime violates the defendant's constitutional right of confrontation).

¶ 203    In the case at bar, defendant does not deny—nor could he—that the charges against both himself and Stanley arose out of a common occurrence. Not only was there a common occurrence, but the jury was also instructed about accountability, and the State argued that defendant was accountable for Stanley's shootings since defendant drove the van from which Stanley fired his weapon. Defendant does not argue that Stanley's defense was antagonistic to his own defense, and the State did not introduce statements by Stanley implicating defendant.

¶ 204    In addition, even if there was any error, defendant invited it, as the following facts show. On October 29, 2012, defendant filed a motion seeking to be severed from both Whitfield and Stanley. However, on May 13, 2013, when defendant's severance motion was heard, the trial court asked:

"THE COURT: Who do you want to be severed from?

DEFENDANT'S COUNSEL: I want to be severed from Mr. Whitfield."

The trial court then asked defendant's counsel if he wanted to argue his motion, and he replied that he did. Defendant's counsel then spent several pages explaining why his client's trial should be severed from Whitfield's trial, concluding with: "we believe, your Honor, that the trial should be severed from Mr. Whitfield." Not once did he mention codefendant Kevin Stanley.

¶ 205    Whitfield's counsel then argued that her client should be severed from both Stanley and defendant because a joint trial would violate the *other* defendants' due process rights. The trial court interjected "Not your client," and Whitfield's counsel responded "Right." The ASA agreed that it "might be just easier to sever Davionne Whitfield's case from the other two." The trial court then stated that defendant's "motion for severance will be granted."

¶ 206    Whitfield's counsel then inquired how they were "proceeding from here," and the trial court ruled as follows:

"THE COURT: I just severed [defendant] from your client [Whitfield]. That's all. My intention would be [defendant] at this point unless [Stanley's counsel] files his own

motion, then I will take a look at it. But I don't think you have grounds to ask for a motion for severance based on what you told me. If you want me to rule on your motion, your motion for severance is denied."

While the "you" in the above paragraph is ambiguous, the "you" seems to refer to Whitfield's counsel and the motion that she made, in essence, on behalf of Stanley for severance.

¶ 207    In any event, defendant's counsel did not object to the trial court's ruling to try defendant and Stanley together and instead inquired only whether there would be one trial with two juries:

"ASA: I think in effect then it would be Stanley and [defendant] being tried with one jury.

THE COURT: One jury, and Mr. Whitfield will have his own jury.

DEFENDANT'S COUNSEL: Is it the Court's desire at this time or maybe you don't know, double jury or—

THE COURT: Let's do it one time. Yeah."

Defendant's counsel again offered no objection to this ruling. As a result, defendant and Stanley were tried together in front of a single jury.

¶ 208    A party may not ask the trial court to proceed in one manner and then later contend on appeal that this course of action was in error. *Ciborowski*, 2016 IL App (1st) 143352, ¶ 99; *People v. Chatman*, 2016 IL App (1st) 152395, ¶ 39 n.15; *Lozman v. Putnam*, 379 Ill. App. 3d 807, 828-29 (2008) (citing *People v. Harvey*, 211 Ill. 2d 368, 385 (2004), citing *People v. Carter*, 208 Ill. 2d 309, 319 (2003)). To permit a party to use, as a vehicle for reversal, the exact action that it procured in the trial court would offend all notions of fair play and encourage duplicity by litigants. *Ciborowski*, 2016 IL App (1st) 143352, ¶ 99; *Lozman*, 379 Ill. App. 3d at 829 (citing *Harvey*, 211 Ill. 2d at 385, citing *People v. Villarreal*, 198 Ill. 2d 209, 227 (2001)). When a party procures or invites a particular ruling by the trial court, even if the ruling was improper, he cannot later contest that same ruling on appeal. *Ciborowski*, 2016 IL App (1st) 143352, ¶ 99 (citing *People v. Bush*, 214 Ill. 2d 318, 332 (2005)).

¶ 209    This is even more true when the issue before the trial court is subject only to an abuse of discretion review. *Cf. Ciborowski*, 2016 IL App (1st) 143352, ¶ 99. How can this court find that the trial court abused its discretion toward a defendant when the court did the very thing which the defendant asked for? See *People v. Johnson*, 2013 IL App (2d) 110535, ¶ 46 (when the parties agree to joinder, a reviewing court has "no application of discretion to review for abuse").

¶ 210    In the case at bar, the trial court specifically asked defendant's counsel who defendant wanted to be severed from, and he stated only Whitfield, with no mention of Stanley. The trial court then gave defense counsel exactly what he had asked for: severance from Whitfield. The doctrine of invited error blocks defendant from raising this issue on appeal, absent ineffective assistance of counsel.

¶ 211    On appeal, defendant asks us to review the issue of his joint trial with Stanley under the plain error doctrine or as ineffective assistance of counsel. We described the plain error doctrine in the prior section, and we will not repeat it here. As we observed above, the first step in the plain error doctrine is to determine whether there was any error at all. *Piatkowski*, 225 Ill. 2d at 565 (under the plain error doctrine, "the first step" is to determine whether any error occurred at all). As we just explained, under the invited error doctrine, we cannot find any.

¶ 212    As for the *Strickland* ineffective assistance test, the first prong requires us to determine whether counsel's performance was objectively unreasonable under prevailing professional norms. *Edgar C.*, 2014 IL App (1st) 141703, ¶¶ 77-78 (citing *Domagala*, 2013 IL 113688, ¶ 36). See also *Strickland*, 466 U.S. at 687. "[I]n order to establish deficient performance, the defendant must overcome the strong presumption that the challenged action or inaction may have been the product of sound trial strategy." (Internal quotation marks omitted.) *People v. Manning*, 241 Ill. 2d 319, 327 (2011). "Matters of trial strategy are generally immune from claims of ineffectiveness of counsel." (Internal quotation marks omitted.) *Manning*, 241 Ill. 2d at 327.

¶ 213    In the case at bar, defendant's counsel's decision to seek severance only from Whitfield and to not object to a joint trial with Stanley could have been a matter of trial strategy. Defendant does not argue that he and Stanley had antagonistic defenses or that statements by Stanley were used against him. Counsel could have reasonably thought that being tried with the more culpable Stanley would make his client look less culpable by comparison. In addition, the initial identification of Stanley occurred a number of days before the initial identification of defendant, which bolstered defendant's counsel's argument that the identification of his client came too late to be believed.[6]

¶ 214    Defendant quotes in support *Byron*, 116 Ill. 2d at 93, which in turn was quoting *United States v. Sampol*, 636 F.2d 621, 647 (D.C. Cir. 1980), which stated:

> "In such cases when there is a gross disparity in the quantity and venality of the testimony against the respective joint defendants it is fair to inquire 'whether the jury can reasonably be expected to compartmentalize the evidence as it relates to separate defendants in the light of its volume and limited admissibility.' [Citations.]" *Sampol*, 636 F.2d at 647.

The above quote states that "it is fair to inquire," which is undoubtedly true. *Sampol*, 636 F.2d at 647. However, it still does not support the idea that a trial court *must* order a severance from one codefendant when counsel argues only for severance from a different codefendant—which the trial court grants—or the idea that a joint trial can never be part of a counsel's reasonable trial strategy. In addition, in *Byron*, the Illinois Supreme Court's primary reason for finding that the trial court erred by not granting the defendant's requested severance is that his " 'defense was clearly entirely antagonistic to' " his codefendant's defense (*Byron*, 116 Ill. 2d at 92 (quoting *People v. Bean*, 109 Ill. 2d 80, 96 (1985))), which is not a factor in this case.

¶ 215    For these reasons, we do not find defendant's severance arguments persuasive.

¶ 216                                   V. Jury Instructions

¶ 217    Defendant also challenges three of the jury instructions given by the trial court.

¶ 218    The trial court's decision to give, or not give, a particular instruction is within the sound discretion of the trial court. *People v. Anderson*, 2012 IL App (1st) 103288, ¶ 34. Generally, a reviewing court will review jury instructions only for an abuse of discretion. *People v. Mohr*, 228 Ill. 2d 53, 66 (2008); *In re Dionte J.*, 2013 IL App (1st) 110700, ¶ 64. An abuse of discretion occurs where the trial court's decision is arbitrary, fanciful, or unreasonable, or

---

[6]Donise Robertson identified Stanley on June 24, 2009, the night of the shooting, as the shooter in the front passenger seat. By contrast, Julius Davis did not identify defendant until July 4, 2009.

where no reasonable person would agree with the position adopted by the trial court. *Ciborowski*, 2016 IL App (1st) 143352, ¶ 88.

¶ 219 Although jury instructions are generally reviewed for an abuse of discretion, our standard of review is *de novo* when the question is whether the given instructions accurately explained the applicable law to the jury. *Anderson*, 2012 IL App (1st) 103288, ¶ 34. See also *Barth v. State Farm Fire & Casualty Co.*, 228 Ill. 2d 163, 170 (2008). *De novo* consideration means that we perform the same analysis a trial court would perform. *Condon & Cook, L.L.C. v. Mavarakis*, 2016 IL App (1st) 151923, ¶ 55.

¶ 220                         1. Circumstantial Evidence Instruction

¶ 221 Defendant claims that the trial court erred by giving IPI Criminal 4th No. 3.02, the circumstantial evidence instruction, over his objection. This instruction states:

> "Circumstantial evidence is the proof of facts or circumstances which give rise to a reasonable inference of other facts which tend to show the guilt or innocence of the defendant. Circumstantial evidence should be considered by you together with all the other evidence in the case in arriving at your verdict." IPI Criminal 4th No. 3.02.

¶ 222 Defendant argues that the trial court erred by giving this instruction because all the evidence against him was direct, namely, the eyewitness identifications of himself and of Stanley, for whom the State argued defendant was accountable. However, the State's evidence was more than just identification testimony. For example, the witnesses testified about the circumstances leading up to the shooting which thereby provided its motive, namely, the internal gang dispute between two factions of the same gang. Also, the circumstances concerning the dispute, the nature of the shooting, and the differing but coordinated roles of the individuals in the van could permit the jury to reasonably infer defendant's accountability for Stanley's actions. Thus, we cannot find that the trial court abused its discretion by deciding to include this pattern jury instruction.

¶ 223                              2. Offense Instructions

¶ 224 Defendant claims that the trial court erred by denying his request to provide modified versions of two pattern jury instructions. Specifically, he contests the trial court's decision to give, as written, IPI Criminal 4th No. 6.07X, which describes the elements for attempted first degree murder and IPI Criminal 4th No. 7.02, which describes the elements for first degree murder.

¶ 225 Both instructions include the following sentence:

> "If you find from your consideration of all the evidence that each one of those propositions has been proved beyond a reasonable doubt, you should find *the* defendant guilty." (Emphasis added.) IPI Criminal 4th Nos. 6.07X, 7.02

Defendant argues that the trial court should have changed the phrase "*the* defendant" to "*that* defendant" because otherwise the instruction does not distinguish between defendants and thereby allows the jury to "consider[ ] all the evidence"—whether or not it applies to defendant—in finding him guilty.

¶ 226 First, Illinois Supreme Court Rule 451 provides that: "Whenever Illinois Pattern Jury Instructions, Criminal, contains an instruction applicable in a criminal case *** and the court determines that the jury should by instructed on the subject, the IPI Criminal instruction *shall*

be used, unless the court determines that it does not accurately state the law." (Emphasis added.) Ill. S. Ct. R. 451 (eff. Apr. 8, 2013). Neither the instructions nor their committee notes provide for modification in the event of a joint trial, and a joint trial is not an uncommon occurrence.

¶ 227　　Illinois Supreme Court Rule 451's use of the word "shall" means that the wording of an instruction is not optional—unless it does not accurately state the law. See *People v. Dominguez*, 2012 IL 111336, ¶ 17 ("The use of the word 'shall' means that it is mandatory ***."); *People v. Robinson*, 217 Ill. 2d 43, 51 (2005) (" 'shall' means shall," and thus is "obligatory"); *People v. Lampitok*, 207 Ill. 2d 231, 261 (2001) ("[T]he primary definition of 'shall' is, '[h]as a duty to; more broadly, is required to.' Black's Law Dictionary 1379 (7th ed. 1999)."). See also *Berz v. City of Evanston*, 2013 IL App (1st) 123763, ¶ 36 ("the use of the word 'shall' means that it is mandatory" (internal quotation marks omitted)).

¶ 228　　Second, when a reviewing court considers a challenge to any one instruction, we do not examine the instruction in isolation but rather we examine the instructions "as a whole" in order to determine whether, in their entirety, they "fairly, fully and comprehensively apprised the jury of the relevant legal principles." *People v. Banks*, 237 Ill. 2d 154, 208 (2010). In considering this question, we exercise *de novo* review. As we explained above, although jury instructions are generally reviewed for an abuse of discretion, our standard of review is *de novo* when the question is whether the given instructions accurately explained the applicable law to the jury. *Anderson*, 2012 IL App (1st) 103288, ¶ 34.

¶ 229　　Here, as defendant observes in his brief to us, the trial court also instructed the jury to give separate consideration to each defendant and that any evidence limited to one defendant should not be considered as to the other. Thus, when we consider the instructions in their entirety, as we must, we cannot find that they failed to accurately explain the applicable law to the jury.

¶ 230　　Thus, for these reasons, we do not find defendant's arguments concerning the jury instructions persuasive.

¶ 231　　　　　　　　　　　　　VI. Closing Arguments

¶ 232　　Lastly, defendant argues that the State committed prosecutorial misconduct during its closing arguments.

¶ 233　　　　　　　　　　　　　1. Standard of Review

¶ 234　　It is not clear whether the appropriate standard of review for this issue is *de novo* or abuse of discretion. We have previously made this same observation in several cases, including *People v. Sandifer*, 2016 IL App (1st) 133397, ¶ 54 ("The standard of review for closing arguments is currently unclear."), *People v. Alvidrez*, 2014 IL App (1st) 121740, ¶ 26, *People v. Land*, 2011 IL App (1st) 101048, ¶¶ 149-51, and *People v. Phillips*, 392 Ill. App. 3d 243, 274-75 (2009). The Second District Appellate Court has agreed with our observation that the standard of review for closing remarks is an unsettled issue. *People v. Burman*, 2013 IL App (2d) 110807, ¶ 26; *People v. Robinson*, 391 Ill. App. 3d 822, 839-40 (2009).

¶ 235　　Our supreme court has found: "Whether statements made by a prosecutor at closing argument were so egregious that they warrant a new trial is a legal issue this court reviews *de novo*." *People v. Wheeler*, 226 Ill. 2d 92, 121 (2007). However, the supreme court in *Wheeler* cited with approval *People v. Blue*, 189 Ill. 2d 99 (2000), in which the supreme court

had previously applied an abuse of discretion standard. *Wheeler*, 226 Ill. 2d at 121. In *Blue* and numerous other cases, our supreme court had found that the substance and style of closing argument is within the trial court's discretion and will not be reversed absent an abuse of discretion. *Blue*, 189 Ill. 2d at 132 ("we conclude that the trial court abused its discretion" by permitting certain prosecutorial remarks in closing); *People v. Caffey*, 205 Ill. 2d 52, 128 (2001); *People v. Williams*, 192 Ill. 2d 548, 583 (2000); *People v. Armstrong*, 183 Ill. 2d 130, 145 (1998); *People v. Byron*, 164 Ill. 2d 279, 295 (1995). Our supreme court has reasoned: "Because the trial court is in a better position than a reviewing court to determine the prejudicial effect of any remarks, the scope of closing argument is within the trial court's discretion." *People v. Hudson*, 157 Ill. 2d 401, 441 (1993). Following *Blue* and other supreme court cases like it, this court had consistently applied an abuse of discretion standard. *People v. Tolliver*, 347 Ill. App. 3d 203, 224 (2004); *People v. Abadia*, 328 Ill. App. 3d 669, 678 (2001).

¶ 236    Since *Wheeler*, appellate courts have been divided regarding the appropriate standard of review. *Alvidrez*, 2014 IL App (1st) 121740, ¶ 26 (noting that the issue remains divided). The First and Third Divisions of the First District have applied an abuse of discretion standard, while the Third and Fourth Districts and the Fifth Division of the First District have applied a *de novo* standard of review. Compare *People v. Love*, 377 Ill. App. 3d 306, 316 (1st Dist., 1st Div. 2007), and *People v. Averett*, 381 Ill. App. 3d 1001, 1007 (1st Dist., 3d Div. 2008), with *People v. McCoy*, 378 Ill. App. 3d 954, 964 (3d Dist. 2008), *People v. Palmer*, 382 Ill. App. 3d 1151, 1160 (4th Dist. 2008), and *People v. Ramos*, 396 Ill. App. 3d 869, 874 (1st Dist., 5th Div. 2009). However, we do not need to resolve the issue of the appropriate standard of review at this time because our holding in this case would be the same under either standard. *E.g.*, *Sandifer*, 2016 IL App (1st) 133397, ¶ 55 (1st Dist., 4th Div.) (declining to choose a standard of review and finding that it "need not resolve the appropriate standard of review because" under either standard the "holding is identical").

¶ 237                                    2. Substantial Prejudice

¶ 238    In order to "preserve claimed improper statements during closing argument for review, a defendant must object to the offending statements both at trial and in a written posttrial motion." *Wheeler*, 226 Ill. 2d at 122. A State's closing will lead to reversal only if the prosecutor's remarks created "substantial prejudice." *Wheeler*, 226 Ill. 2d at 123; *People v. Johnson*, 208 Ill. 2d 53, 64 (2003); *People v. Easley*, 148 Ill. 2d 281, 332 (1992) ("The remarks by the prosecutor, while improper, do not amount to substantial prejudice."). Substantial prejudice occurs "if the improper remarks constituted a material factor in a defendant's conviction." *Wheeler*, 226 Ill. 2d at 123.

¶ 239    When reviewing claims of prosecutorial misconduct in closing argument, a reviewing court will consider the entire closing arguments of both the prosecutor and the defense attorney in order to place the remarks in context. *Wheeler*, 226 Ill. 2d at 123; *Johnson*, 208 Ill. 2d at 113; *People v. Tolliver*, 347 Ill. App. 3d 203, 224 (2004). A prosecutor has wide latitude during closing argument. *Wheeler*, 226 Ill. 2d at 123; *Blue*, 189 Ill. 2d at 127. "In closing, the prosecutor may comment on the evidence and any fair, reasonable inferences it yields ***." *People v. Nicholas*, 218 Ill. 2d 104, 121 (2005).

¶ 240    "Statements will not be held improper if they were provoked or invited by the defense counsel's argument." *People v. Glasper*, 234 Ill. 2d 173, 204 (2009). For example, in *Glasper*, defendant argued that the prosecutor had "shifted the burden of proof to defendant" when, in

response to defendant's claim of a coerced confession, the prosecutor had argued in rebuttal closing: " 'Where's the evidence of that?' " *Glasper*, 234 Ill. 2d at 212. Our supreme court found that the comment "did not shift the burden to defendant" but that it merely "pointed out that no evidence existed in this case to support defendant's theory" and that it was "invited by defense counsel's argument." *Glasper*, 234 Ill. 2d at 212.

¶ 241                                 3. Parties' Arguments

¶ 242    Defendant argues that the State engaged in prosecutorial misconduct in closing arguments in three specific ways: (1) by asserting that counsel fabricated its argument that identifying witnesses had colluded against defendant, (2) by applying evidence to defendant that was applicable only to his codefendant in order to "bridge the gap in evidence" and convict defendant, and (3) by using arguments that were designed to inflame the passions of the jury in order to distract from the issue of whether the identifying witnesses' testimony was credible.

¶ 243    In response, the State argues that defendant failed to preserve for review most of the statements objected to during closing argument by including only two of the objected-to comments in his posttrial motion. In addition, the State argues that its comments during closing argument either drew proper inferences from the evidence or responded to comments made during the defense's closing arguments.

¶ 244    Defendant concedes that he did not preserve for review all of the comments that he now claims constituted prosecutorial misconduct. However, he asks us to review them either pursuant to the plain error doctrine or as ineffective assistance of counsel.

¶ 245                                 4. Conspiracy Arguments

¶ 246    The first set of remarks that defendant challenges on appeal concern the prosecutor's response in its rebuttal to the defense's conspiracy argument. In his closing, defendant argued that all three identifying witnesses shared a motive to falsely identify defendant, who belonged to a rival gang faction, and that all three identified defendant too late to be believed. In response, the State argued that, "when everything is against you, you just come up with stuff. Collusion." Defendant objected, and the trial court sustained the objection. Later, the State argued that the defense's conspiracy argument was a "big pile of hooey" and that it was "Grandma Donise" who would have had to be at the center of any alleged conspiracy, not Andre Turner, since Donise Robertson was the first person to identify people in the van. Defendant did not object to the comments regarding "hooey" and "Grandma Donise."

¶ 247    On appeal, defendant argues that his conspiracy theory was not a "pile of hooey" because it was supported by reasonable inferences drawn from the evidence—essentially, the same arguments that the defense made during its closing. Defendant also argues that the prosecutor was mistaken in suggesting that Donise Robertson identified defendant when she did not.

¶ 248    We do not find defendant's arguments persuasive because, first, defense counsel had an opportunity to explain to the jury during his closing why defendant's conspiracy theory was based on reasonable inferences drawn from the facts, and thus the jury was not deprived of an opportunity to hear and consider both sides of this issue. Second, the prosecutor did, in fact, state during the State's rebuttal that "Grandma Donise never identifies the driver." Thus, we find that these comments did not create substantial prejudice.

### 5. Conflating Defendants

¶ 250    Next, defendant argues that the prosecutor committed misconduct during the State's rebuttal by mistakenly lumping the defendants together. The prosecutor argued: "All four main witnesses misidentified the same three defendants. Let me say that again. All four main witnesses misidentified the same three defendants. What are the chances of that?" Although the defense did not object to these remarks at the time, defendant argues now that these remarks were factually inaccurate, since only three of the main witnesses identified defendant. Defendant is correct that only three of the main witnesses identified defendant. However, since attacking these three identifications was the main subject of the defense's closing, we cannot find that these remarks created substantial prejudice.

¶ 251    The prosecutor also argued that codefendant Stanley's alibi witnesses were as credible as a belief in "the Easter Bunny" and "*they* want you to rely on that testimony in setting *them* free." (Emphases added.) Defendant's counsel objected, and the trial court ruled: "As to 'them,' I'll sustain it." Counsel also preserved his objection to this remark in his posttrial motion. In light of the fact that the State argued that defendant was liable for Stanley's actions under an accountability theory, we cannot find that this remark created substantial prejudice.

### 6. Allegedly Irrelevant Evidence

¶ 253    Defendant argues that the State cited evidence in closing that was irrelevant with respect to defendant. First, defendant contests the following remarks made in the State's initial closing argument:

> "And I want you to think about the investigation in this case. You heard about all these guns and you saw all these guns here. You've heard about different people that were brought in, put in line-ups in relation to evidence. The police in this case did everything you would ever ask them to do. They cast a wide net. Who is this? Why did [they do] this? Anybody. Let's find out who it is. Let's get every gun that's associated with anything, find out if it's the murder weapon."

¶ 254    Defendant argues that these remarks were improper because they asked the jurors to focus on the thoroughness of the State's investigation rather than the primary issue, which was the credibility of the three identification witnesses. Defendant did not object to these comments at trial and thus failed to preserve them as an issue for our review. However, this issue is just a recasting of defendant's earlier argument that this evidence was irrelevant, which we addressed earlier and found unpersuasive. *Supra* ¶ 197.

¶ 255    Defendant also contests the following remarks made by the State in rebuttal:

> "All the evidence in this case, testimony, physical, scientific, medical, expert demonstrative, photographic, paints one picture, ladies and gentlemen, you know what it is, that there was a dispute, an intra-gang rival dispute between the defendants and others.
>
> They stole a van, they surprise attack, they fired on unsuspecting, unarmed individuals at that time and innocent people. They drove off, ditched the car, and ran into their neighborhood and they're still trying to run today. That's the State's case. Okay."

Although defendant did not object at trial to these remarks, defendant argues now that all the "physical, scientific, medical, expert demonstrative, photographic" evidence in this case was

irrelevant with respect to defendant and that the only relevant question for him was whether the three identification witnesses were credible. What defendant overlooks is that the other evidence was relevant to proving the circumstances of the drive-by shooting—the physical evidence of the fired cartridge cases recovered at the scene and in the van, the scientific and expert evidence that these cases were fired from at least two different guns, the medical and expert evidence that Chastity Tuner died from a gunshot wound that was not fired at close range, and the photographic evidence concerning the photo arrays and identifications. Thus, we do not find this argument by defendant persuasive.

¶ 256                              7. Remarks About Gangs

¶ 257        Defendant argues that the State emphasized gang violence in both its opening and closing remarks.

¶ 258        How do you prosecute a drive-by shooting by one gang faction against another faction without talking about gangs? Defendant argues that the State improperly emphasized gang violence in the neighborhood. This is a case where a nine-year-old child was gunned down while washing her pet dogs in her own driveway. The emphasis was inherent in the crime itself. Thus, we cannot find this argument persuasive.

¶ 259                                  CONCLUSION

¶ 260        On this appeal, defendant claimed (1) that the State failed to prove defendant guilty beyond a reasonable doubt, (2) that the trial court erred by allowing hearsay testimony by a police officer that he issued an investigative alert for defendant's arrest after a photo array and statement by a witness who did not testify at trial, (3) that defendant was denied a fair trial when the State was permitted to introduce evidence of allegedly unrelated guns and other allegedly unrelated information, (4) that defendant was denied a fair trial by being tried jointly with codefendant Kevin Stanley when the evidence against Stanley was allegedly greater, (5) that defendant was denied a fair trial by allegedly inaccurate or misleading jury instructions, and (6) that the State committed prosecutorial misconduct in its closing arguments.

¶ 261        For the foregoing reasons, we do not find these arguments persuasive and affirm.

¶ 262        Affirmed.